# EXHIBIT B

EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

MICHAEL & NATALIE FREY, *on behalf* )
*of* PINEVILLE COMMUNITY HEALTH )
CENTER, INC. )
)
)
       PLAINTIFFS )
)
v. )  CIVIL ACTION NO. 6:24-CV-178-REW
)
)
DENNIS VARGHESE and SHERYL )  ***ELECTRONICALLY FILED***
RICHTER )
)
)
       DEFENDANTS )
)

## DECLARATION OF DENNIS VARGHESE

My name is Dennis Varghese. I am over 18 years of age and competent to testify. I am a resident of the State of New York and I make this declaration based on my personal knowledge and belief.

    1.    I am the board representative for Payroll Card Formula, Inc. (PCF), the Lender to Pineville Community Health Center, Inc..

    2.    I am also Chairman of the Board of Pineville Community Health Center, Inc..(PCHC)

    3.    I am familiar with all the events leading up to this false claim made by the Natalie and Michael Frey and I provide the true and accurate facts below:

1

**Establishment of Corporate Governance**

4. I first learned about PCHC through of a referral from Michael Frey to the former lender controlled board of the hospital.

5. I learned from the highly respected board members Ken Jones and Katherine Reese that their regional bank, First State Bank of the Southeast, had stepped in to save Pineville Hospital from closing by injecting over $10,000,000 in 2019.

6. Ken Jones was president of First State Bank and Katherine Reese was the Chairman of the Board of First State Bank.

7. While they didn't need to, they and the bank had strong ties to this hospital and to Pineville itself and they decided to take on this tremendous risk to save the hospital from closing.

8. I was moved by their story and desire to keep the hospital open.

9. Over several discussions with them it became apparent that the hospital loans weren't an appropriate asset for this type of banking institution.

10. Payroll Card Formula discussed the possibility of taking over the lender position and management of the hospital to both keep the hospital from closing and to preserve all the creditors from getting wiped out in a hospital closure.

11. I presented a term sheet in January 2023 where every word was heavily negotiated between PCF, Ken Jones, and Katherine Reese. **Exhibit 1** is a copy of the executed term sheet agreement.

12. Here is an excerpt from the term sheet to give a clear status of the hospital in January 2023:

> *Pineville Community Health Center, Inc. (PCHC) is currently facing insolvency and is in urgent need of a rescue plan. iMed, a hospital consultant and manager, is proposing to take action to save PCHC from closure. The aim of the proposed financing to Pineville, along with the implementation of a new management team and action plan, is to prevent the devastating consequence of liquidation and*

*termination of all employees, as well as preventing the wiping out of existing creditors. It is our belief that this plan will provide relief and better prospects for the future of Pineville and its citizens.*

13. At the time, all the employees were about to be fired, all creditors were about to lose over $10,000,000 and the single largest employer in the region was about to close and cause permanent damage to the community.

14. PCF (the Preservation Funding Lender) was willing to take on this very difficult and risky lending proposition based on several basic terms agreed to by the First State Bank lender controlled board in order for another lender (PCF) to step into their position and catch this falling knife.

15. These terms included:

- Appointment of a turnaround advisor of PCF's choosing called Kentucky Medical Management, LLC.
- First State Bank to transfer all its Liens to PCF. A copy of the UCC transfers from First State Bank to PCF is attached as **Exhibit 2.**
- A 4-year buyout plan for PCF which would completely recover all the money lent by the creditors
- A strict change to the membership and governance of the non-profit hospital corporation, including PCF ability to appoint up to 4 board members,
- A written agreement to refinance the old lender out of harm's way as soon as possible.
- A written agreement not to close the hospital.

16. These negotiated terms and nothing less would work for both the old lender (First State Bank) and the new lender (PCF).

17. The old lender would be able to recover 100 % of their outstanding loans to the hospital when faced with the possibility of getting zero dollars. It is customary for a massive discount to be applied to that lender payoff for example 10 cents on the dollar in a bankruptcy. PCF did not demand this.

18. For PCF, the new lender, these membership and governance terms would give it comfort in effecting all improvements and choosing any management at its sole discretion.

19. The PCF 100 percent bailout offer was criticized by those familiar with the matter as too generous and much more than other offers made to the former hospital board.

20. The alternative competing offers I became aware of consisted of:
- parties looking to buy the hospital out of the imminent bankruptcy for pennies,
- parties looking to close the hospital permanently, and
- parties looking to convert the hospital into a budget hotel.

21. When PCF and the previous board came to an agreement on February 10 of 2023 the hospital had negative bank balances in the hundreds of thousands of dollars.

22. To be clear, there was no money to make the next payroll and less than $0 in the bank with the bank accounts overdrawn and a long list of unpaid creditors.

23. As part of the negotiation of the term sheet agreement, on January 11, 2023 Kevin Couch, PCHC's then Administrator/CFO emailed me a copy of the PCHC By-Laws. He copied Michael Frey and Teresa McCarty, who was the Hospital's long time corporate secretary and the person responsible for maintaining PCHC's official corporate documents including the Board By-Laws.

24. The By-Laws emails to me by Kevin Couch are attached as **Exhibit 3**. These are the By-Laws which the lender controlled Board amended on February 10, 2023.

25. I have reviewed Exhibit 3 to the Freys' Motion for Preliminary Injunction. The By-Laws of Pineville Community Health Center attached to that Motion as Exhibit 3 were not the Pineville Community Health Center, Inc.'s By-Laws emailed to me and subsequently amended by the Board.

26. I have never seen Exhibit 3 to the Freys' Motion for Preliminary Injunction.

## HOW DID WE GET HERE – MEETING THE FREYS:

27. In one of my earliest memories of him, Michael Frey had pleaded with me to lend him $300 because he couldn't take care of his family and pay for his electricity bill. He was embarrassed to ask anyone in his extended family or tell his wife and he said he would pay it back as soon as he could, which he didn't, which would become a recurring theme.

28. I ended up sending the $300 as a loan that Michael would never bring up again and never bother to repay.

29. From this point forward he started cozying up to me making all kinds of claims about some abilities he had/has in an effort to convince me to keep talking to him and possibly entertain investments he was proposing.

30. As PCF got closer to making an investment into the hospital, Michael began to request personal loans. He was calling me "buddy" and "brother" and telling me anything I wanted to hear in order to get money to pay his rent, fix a leaking roof and fund his daughter's college.

31. In total, Michael took loans from PCF in excess of $50,000 which he has failed to repay. A copy of PCF wires to Michael Frey, individually, is attached as **Exhibit** 4.

## THE DEFAULT AND THE ASSAULT AND THE NOT SO MISSING MONEY

32. On September 15, 2023 the Hospital's September 15, 2022 Commercial Security Agreement, Business Loan Agreement and Commercial Line of Credit Loan Number 98134 with First State Bank of the Southeast (FSB), had matured. Michael Frey, accompanied by the then PCHC CEO, Tim York had a meeting with Ken Jones, the President of First State Bank to ask for a renewal. Mr. Jones refused the request without additional financial documentation. During the meeting Michael Frey yelled at Mr. Jones and threw a package at him hitting him in the head. In response, First State Bank froze the Hospital's funds. Not only was Michael Frey's actions highly

unprofessional and put the Hospital at risk of a suit if Mr. Jones pressed charges, it violated the terms of the Credit and Security Agreement between PCHC as Borrower and PCF as Lender.

33. In November 2023 PCHC, as Borrower was in default of its obligations under the Credit and Security Agreement with PCH. It was in default of its Financial Covenants under Section 6.18 as Borrower failed to meet the financial performance metrics required. Specifically, Borrower did not maintain the minimum levels of financial performance necessary to comply with this section, constituting an Event of Default under Section 7.02 (Covenant Default). PCHC was also in default of its insurance obligations under Section 5.11 which required Borrower to maintain insurance policies as described therein. Borrower's failure to provide evidence of the required coverage constituted a breach of this affirmative covenant and an Event of Default under Section 7.02 (Covenant Default). PCHC's default on its $2,500,000 loan from First State Bank also constituted a default under Section 7.06 (Other Agreements) by failing to adhere to the obligations set forth in agreements with third parties, which materially adversely affect the Lender's interests.

34. Pursuant to the Credit and Security Agreement, the Lender was entitled to take the following actions:

1. Demand Immediate Payments. Under Section 8.01 (Rights and Remedies) and Section 8.03 (Protective Payments), the Lender has the right to demand immediate payment of all outstanding obligations. Furthermore, under Section 8.03, the Lender may make any payments or take any actions it deems necessary to protect its interests in the Collateral and recover such amounts as additional obligations of the Borrower.

2. Take Control Over Collateral. As stipulated in Section 11.01 (Collateral), all of Borrower's bank accounts, including but not limited to deposit accounts and

other financial accounts, are pledged as Collateral for the benefit of the Lender. This includes the Borrower's operating accounts, government receivables deposit accounts, and any other accounts identified or controlled under the terms of the agreement.

3. Apply the Collateral to Satisfy the Borrows Obligations. In accordance with Section 8.05 (Application of Payments and Proceeds Upon Default), the Lender has the right to apply payments or proceeds derived from Collateral to satisfy Borrower's obligations under the agreement. This includes proceeds from accounts receivable, government receivables, and other financial assets pledged as Collateral.

35. On November 6, 2023, pursuant to the terms of the February 10, 2023 Credit and Security Agreement between PCHC, as Borrower, and Payroll Card Formula as Lender, PCF asked PCHC to transfer amounts of $7,000,000 directly to the lender to meet PCHC loan obligations.

36. Six million dollars was transferred to the account of PCF at Exchange State Bank in Adair Iowa and one million dollars was transferred to the account of Kentucky Medical Management at Exchange State Bank. A copy of the wire transactions and receipts associated with these transfers are attached as **Exhibit** 5.

37. The Lender's actions in requesting payments, making protective payments, initiating collateral movements, and recommending prudent cash management strategies are proper and fully authorized under the terms of the Credit and Security Agreement.

38. None of the funds were transferred to Mr. Varghese or Mrs. Richter.

39. As part of sound cash management principles, it is customary, advisable, and permissible under the terms of the Credit and Security Agreement, including Section 5.08

(Payment of Obligations) and Section 5.20 (Operating Accounts), for Borrower to optimize the use of its funds. This includes moving excess balances from non-interest-bearing operating accounts into short-term Certificates of Deposit (CDs) or other similar instruments that accrue interest. Such practices not only ensure the efficient use of cash but also serve to enhance the Borrower's financial position and reduce the overall cost of capital, while maintaining liquidity for operational needs.

40. Since executing the Credit and Security Agreement, PCF has maintained its open line of credit with the Hospital and provided all required funding.

41. The hospital is solvent, is current on its loan obligations and in no danger of closure.

42. PCHC has no claims against Payroll Card Formula and in fact owes its survival to the PCF rescue plan.

43. Michael Frey was aware of the transfer in November 2023 and raising an issue about a legitimate transfer more than a year later is a pretense to defame PCF representatives and divert attention from his own conversion of Hospital funds.

44. The Lender, PCF had taken all the risk, and is also out over $50,000 to Michael Frey in personal loans. This to me speaks to his lack of character, lack of integrity, breathtaking ignorance, and basic greed.

**WHY DID THE FREYS MAKE DEFAMATORY ACCUSATIONS NOW**

45. In November 2024, a whistleblower alerted the Hospital to the fact that the Freys, with the aid of Susan Scott, had opened a bank account in PCHC's name without authority and with false documentation diverting insurance payments and hospital payments to this secret account.

46. Upon investigation, PCHC found over $1 Million in diverted and stolen funds were deposited into this unauthorized account at Commercial Bank of Pineville.

47. At no time was the account authorized by the PCHC Board or any creditor or lender to PCHC.

48. While the full extent of the withdrawals by Michael Frey are still being investigated, PCHC has learned funds were removed by Michael Frey to purchase a luxury truck and multiple checks were made out to cash and the money taken by Michael Frey. It further appears numerous checks were made payable to friends and acquaintances of the Freys with these diverted PCHC funds.

49. The Hospital has recently learned that when opening the Commercial Bank account, Michael and Natalie Frey listed themselves as each being 50% owners of the hospital.

50. In order to conceal this unauthorized bank account at Commercial Bank the Freys blocked the board authorized update to the Hospital Enterprise software, first decided by the Board in December 2023, and then reaffirmed June 2024 to change the software.

51. Bank accounts for hospital payments and received checks are directly connected into the hospital Electronic Medical Records (EMR) and Enterprise software.

52. Had this updated Enterprise and EMR software been installed when directed, updating the software would have alerted Hospital Administration that funds were being delivered to an unknown account at Commercial Bank.

53. In order to conceal the authorized Commercial Bank account, Michael Frey, with the assistance of Susan Scott began blocking access by the accounting and technology staff to the Hospital's EMR Enterprise software. This lack of access resulted in delayed reporting to Medicare.

54. If the staff had access to the software data, the Medicare Cost Report would have been timely filed.

55. Michael Frey's direct blocking of the data compilation necessary for completing the cost report in a timely manner was a smokescreen to direct eyes away from his unauthorized Commercial Bank account and is a manufactured problem with Medicare reporting that he himself created.

56. Michael Frey and Natalie Frey and Susan Scott fought this software from being updated. Only after a whistleblower came forward did the Board understand why.

57. In addition to the foregoing, a whistleblower has come forward since the Freys termination and has shown the current Hospital Administration that several service lines in the hospital were blocked from being billed to prevent the discovery of checks being diverted away from the Hospital and into the secret Commercial Bank account. Had the EMR and Enterprise software been updated as directed it would have revealed the diverted checks. The following service lines were not being billed for.

**Specialty Orthopedic Clinic**

A facility offering advanced care for musculoskeletal conditions, including joint replacement, sports injuries, and chronic orthopedic issues. It specializes in diagnosing, treating, and managing injuries and conditions related to bones, joints, ligaments, and muscles.

**Rural Health Clinic (RHC)**

A clinic designed to improve access to primary care in underserved rural areas. RHCs provide affordable, quality healthcare services, often including preventative care, chronic disease management, and minor acute care.

**Anesthesia Services**

Providing perioperative care, pain management, and sedation for surgical and non-surgical procedures. This includes general, regional, and local anesthesia, as well as pre- and post-anesthesia assessments.

**Telehealth**

Virtual healthcare services that allow patients to consult with medical professionals remotely via video, phone, or other digital platforms. Telehealth can cover specialties like primary care, behavioral health, and chronic disease management.

**Swing Bed Services**

Transitional care in a hospital setting for patients recovering from surgery, illness, or injury. These beds provide short-term rehabilitation, skilled nursing, and therapy services, helping patients bridge the gap between acute care and returning home.

**Behavioral Health Unit (BHU) Professional Fees**

Charges associated with professional psychiatric and psychological care, including consultations, therapy sessions, and mental health evaluations, typically offered within an inpatient or outpatient behavioral health unit.

**General Surgeon Fees**

Professional fees for surgical procedures performed by general surgeons, covering services like appendectomies, hernia repairs, and other non-specialized surgeries.

**Orthopedic Surgeon Fees**

Fees for surgeries performed by orthopedic specialists, such as knee replacements, spinal surgeries, and fracture repairs.

58. The financial implications of lost revenue of the above service lines annualized looks like this.

| Service | Monthly Volume | Rate | Annual Loss | ALOS |
|---|---|---|---|---|
| Specialty Orthopedic Clinic | 50 | 12500 | $ 7,500,000 | |
| Rural Health Clinic | 750 | 150 | $ 1,350,000 | |
| Anesthesia Services | 150 | 2250 | $ 4,050,000 | |
| Telehealth | 400 | 112.5 | $ 540,000 | |
| Swing Bed Services | 30 | 400 | $ 1,008,000 | 7 |
| Behavioral Health Unit | 300 | 150 | $ 540,000 | |
| General Surgeon Fees | 40 | 10000 | $ 4,800,000 | |
| Orthopedic Surgeon Fees | 50 | 25000 | $ 15,000,000 | |
| Total Annual Unbilled Services | | | $ 34,788,000 | |

59. This blocking of billing costs the hospital 34 Million Dollars in annualized unbilled services. All to keep the business office from discovering the secret bank account. The hospital still has to pay for all these people to do the work but can't bill for any of the above.

60. The Freys actively blocked these software updates to prevent discovery of the over 1 Million dollars of stolen funds.

I affirm under the penalties for perjury that the foregoing representations are true.

Dennis Varghese

Date: 12/30/24

101836968.2