UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| MICHAEL FREY & NATALIE FREY, *on behalf of* PINEVILLE COMMUNITY HEALTH CENTER, INC. | ) ) ) ) No. 6:24-CV-178-REW-EBA |
| Plaintiffs, | ) ) |
| v. | ) OPINION & ORDER ) |
| DENNIS VARGHESE, *et al.*, | ) ) |
| Defendants. | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Michael and Natalie Frey, purporting to sue on behalf of Pineville Community Health Center, Inc. (PCHC), move for a preliminary injunction to reinstate them to their respective positions as President/CEO and Director of the hospital, freeze allegedly misappropriated funds, and compel Defendants to provide PCHC with the necessary accounting to file Medicare reports. *See* DE 8 at 2. The Defendants, who are current Directors, responded in opposition to the motion, *see* DE 11, and the Freys replied, *see* DE 13. The Court held an evidentiary hearing to take any proof supplementary to the written record. *See* DE 21. The matter is now ripe for review. Because the Freys fail to show a likelihood of success on the merits of their derivative claims and fail to demonstrate irreparable injury, the Court **DENIES** DE 8, the Freys' preliminary injunction request.

**I.  Background**

The buildup to this case goes back at least to 2018. Since then, Pineville Community Health Center—a nonprofit hospital, incorporated under KRS 273—has repeatedly struggled with solvency and financial stability. The hospital, which provides various forms of healthcare to Bell County, Kentucky and its surrounding counties, filed for Chapter 7 bankruptcy in November 2018.

1

*See* DE 11-1 at 2. After struggling for several years more following a cash infusion, the hospital again faced sharpening, indeed existential, financial difficulties in 2023. *See id.* at 3. With the prospect of liquidation and closure looming, on February 2, 2023, PCHC entered into an emergency financing agreement with Payroll Card Formula, Inc. (PCF), to provide PCHC with, among other things, preservation funding of $700,000. *See* DE 11-2 at 2–4; 11-19 at 2–4. The agreement also contained ancillary provisions relating to PCF's relationship with PCHC post-agreement. It required the resignation of PCHC's current Board of Directors (Board) with replacement to be determined by PCF, compelled the current board of directors to appoint Kentucky Medical Management (KMM) as the new turnaround manager for the deal, prohibited PCF from shuttering PCHC unless the hospital remained in the red for three consecutive years, and granted PCF a four-year option to purchase PCHC, unencumbered, for $7,500,000. *See* DE 11-2 at 2–4; 11-19 at 2–4. All three of PCHC's then-directors signed the agreement, along with PCF and KMM representatives. *See* DE 11-2 at 4; 11-19 at 4. The term sheet acknowledges the financial extremity for the hospital as a going concern.

Alongside the financing term sheet, PCHC soon entered into a separate Credit and Security Agreement (Credit Agreement), which provided PCHC with up to $50 million in funding from PCF, to be drawn down, under strict terms, at PCHC's election. *See generally* DE 11-6. As part of that agreement, PCF was assigned certain liens held by PCHC's prior lender, First State Bank. *See* DE 11-20. Relevant here, the Credit Agreement included various protective provisions for PCF, triggered by PCHC's default. In the event of a default, Sections 8 and 11 of the Credit Agreement entitled PCF to demand immediate payment of all outstanding obligations owed to PCF, to take control of PCHC's collateral, including its bank accounts and all other collateral pledged to PCF, and/or to apply any payments or proceeds derived from PCHC's collateral as satisfaction of any

2

obligations under the Agreement. *See* DE 11-6 at 59–63; 74–76.  Other lenders were in the mix, and PCF's priority, presumably except to accounts receivable, is unclear.

The Board then implemented the terms of the financing agreement through a series of cascading resolutions. On February 10, 2023, it appointed Act Abroad Group (AAG), a designated nonprofit, as the sole member of PCHC. *See* DE 11-3 at 2–3. Simultaneously, it amended PCHC's bylaws to limit PCHC membership to "a single member," with "all rights, powers, and privileges granted to members under these bylaws." *See id.* at 5–7. It further amended the bylaws to grant the sole member "full decision making authority on any issue that may have previously been properly brought before any meeting of the members." *Id.* That power included a "one hundred percent (100%) vote on each matter submitted to a vote of the members." *Id.* This unanimous adoption left AAG, as the sole member, with centralized authority to appoint the Board, along with any issue normally reserved to the members for a vote. *See* DE 11-5 at 2–4. As the sole member, AAG selected Defendant Sheryl Richter as the member representative. *See* DE 11-1 at 3.

The prior Board remained in place for a time after the funding deal.  Then, in April 2023, AAG, via Richter, removed the previous Board and appointed three new members.  *See* DE 11-4 at 2. Defendant Richter, acting as AAG's representative, appointed as the three Board members Defendant Dennis Varghese, Plaintiff Natalie Frey, and Richter herself. *See id.* at 3. In the same action, Richter designated Defendant Varghese as chairman of the Board. *See id.* at 5. The next month, PCHC entered into a consulting agreement with Frey Consulting, and nearly a year later, in April 2024, the PCHC Board hired Plaintiff Michael Frey as President and CEO of PCHC. *See* DE 11-1 at 5.[1]

---

[1] The Freys offer much historical and documentary misdescription in their complaint and motion.  Thus, no documents support that Natalie Frey was ever chair or that Michael Frey was an ex officio board member.  The bylaws on which the Freys rely plainly are not the ones the regime actually enacted.

3

Much of this suit concerns a November 2023 transfer of $7 million from PCHC to PCF and KMM. Because the propriety of the transfer is highly disputed, the Court focuses only on the undisputed facts surrounding the transfer, rather than any underlying motive or justification. On November 6, 2023, PCHC transferred $7,000,000 of hospital funds to accounts controlled by PCF and KMM. *See* DE 11-13. Wire transfer documentation shows that $6 million of the funds were wired to a PCF bank account, *see id.* at 2, while the other $1 million was wired to an account controlled by KMM, the turnaround manager, *see id.* at 6. At the time, the emergency financing agreement and the Credit Agreement were in effect. Natalie Frey was a PCHC Board member, but Michael Frey had not been hired as CEO and only had connections with PCHC through the Freys' consulting agreement, the exact scope of which is unclear on this record. Defendants cite the Credit Agreement's default provisions as justifying the transfer to protect collateral and meet loan obligations, *see* DE 11 at 6–8. The Freys allege that the transfer was a fraudulent (indeed, criminal) misappropriation of hospital funds by Defendants without knowledge or consent of the PCHC Board, nor any other PCHC decisionmaker. *See* DE 8 at 3–4. Verified evidence of the current location of the funds is not in the record. The entities involved are not named defendants.

The other bulk of the suit—the Freys' terminations as Director and CEO—in many ways flows from the first dispute. The Freys claim that they first learned of the $7 million transfer in November of 2023. *See* DE 8-1 at 3. At the time, according to the Freys, Varghese assured the Board and the then-CEO that the transfer was to a different hospital account. *See id.* However, in Fall 2024, as now-CEO Michael Frey was preparing to file PCHC's yearly Medicare Cost Report, he purportedly discovered that the funds were transferred to Exchange State Bank in Iowa and into an account not controlled by the hospital. *See id.*

To facilitate preparation of the hospital's 2023 Medicare Cost Report, due at end of November 2024, the Freys "demanded that Defendants account for and return the misappropriated

4

funds." DE 8 at 4. After receiving a response the Freys believed unsatisfactory, they retained counsel, who sent a demand to Varghese and Richter on November 22, 2024, "seeking an accounting and return of all funds, and to require Defendants to furnish the needed financial information" to complete the Medicare Cost Report. *See* DE 8-1 at 5. Richter responded by email to counsel, indicating that Defendants were retaining counsel of their own, who would then respond to the request. *See* DE 1-1 at 41.

On November 27, 2024, the Freys and certain other hospital staff discovered that their access to all PCHC bank accounts was terminated. *See* DE 8-1 at 5. Later that day, Varghese called the Freys and informed them that they were terminated from their positions as Director and CEO of PCHC. *See id.* Later correspondence from the Defendants' retained counsel indicated that AAG, as the sole member of PCHC, voted to remove Natalie Frey as a Board member, and after appointing a replacement member, the new Board voted to terminate Michael Frey as CEO and end any consulting agreement. *See* DE 1-1 at 43–44; *see also* DE 11-9; DE 11-11.

The Freys then filed suit against Dennis Varghese and Sheryl Richter in Bell Circuit Court. *See* DE 1-1. The complaint, postured derivatively, alleged statutory and common law breach of fiduciary duty, conversion regarding the money transfer, and an action for declaratory relief targeting the invalidity of the Freys' terminations. *See id.* Defendants then removed to this Court on December 5, 2024, on the basis of diversity jurisdiction. *See* DE 1. Thereafter, the Freys quickly filed the instant motion for a preliminary injunction. *See* DE 8.

The Freys' motion requests three forms of injunctive relief from the Court. First, the Freys request "a preliminary injunction to invalidate Defendants' efforts to oust the Freys and to restore them to their positions" as Director and CEO. *See* DE 8 at 2. That result, as the Freys see it, "will enable the hospital to function and keep its doors open pending" resolution of the case. *See id.* Second, they request an injunction to "freeze the misappropriated funds" transferred from PCHC's

5

accounts in November 2023. *See id.* And finally, they request an injunction "requiring Defendants to provide all necessary accounting to enable Medicare reports to be filed." *Id.* The Court instituted a briefing schedule and conducted a prompt and plenary hearing.

## II. Legal Standard

Federal Rule of Civil Procedure 65 empowers federal courts to enter preliminary injunctions in appropriate cases. *See* FED. R. CIV. P. 65(a). The purpose of a preliminary injunction generally is to preserve the status quo pending a trial on the merits. *See S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017). Practically, because a preliminary injunction happens, if at all, before the parties have developed the record, the movant is "not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Still, courts must approach the request skeptically. A preliminary injunction is an extraordinary remedy, and one never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (preliminary injunctions are "extraordinary and drastic" remedies). The burden is always on the movant to justify the request. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020).

Access to this extraordinary remedy turns on four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction." *Hargett*, 978 F.3d at 385. These factors are not prerequisites and are meant instead to be balanced and assessed against the others to create a wholistic picture. *See id.*; *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The first two factors are the most integral. "A preliminary

6

injunction issued where there is simply no likelihood of success on the merits" must be reversed on appeal. *See S. Glazer's Distributors of Ohio, LLC*, 860 F.3d at 849. And not even the strongest showing on the three other factors can save a showing of harm that traditional processes could remedy. *See D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 326–27 (6th Cir. 2019).[2] The Supreme Court recently reconfirmed the elements and the requirement that the movant "must make a clear showing" as to the rubric's components. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).

### III.   Analysis

#### a.   Likelihood of Success on the Merits

To establish a strong likelihood of success on the merits, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023). Reaching that bar "requires a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance." *Clark v. A&L Homecare and Training Ctr.*, 68 F.4th 1003, 1011 (6th Cir. 2023). In doing so, the plaintiff need not "establish his right to an injunction wholly without doubt," nor "prove his case in full." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 693 (S.D. Ohio 2023) (citing *Certified Restoration Dry Cleaning Network, LLC*, 511 F.3d at 542). And although no single factor controls, "a finding that there is simply no likelihood of success on the merits is normally fatal." *Stryker*, 60 F.4th at 385. Indeed,

---

[2] The rules of evidence do not fully apply in the injunction context. Given the preliminary and summary nature of the inquiry, a court may consider hearsay and other proof not formally admissible. *See J.P. Morgan Sec. LLC v. Logsdon*, No. 3:22-CV-14-BJB, 2022 WL 179606, at *1 (W.D. Ky. Jan. 18, 2022) (noting that "a long line of authority in this Circuit" supports "trial judges . . . resting temporary injunctive relief on evidence that would not be admissible at trial" and collecting cases); *see also In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 n.4 (6th Cir. 1985). Here, the Court has considered the testimony at the hearing as well as the affidavit and documentary proof submitted by the parties in the briefing.

the Freys' doubtful likelihood of success is just that—fatal—both procedurally and on the merits. The Court takes each in turn.

The Freys first fall short of likelihood of success because the derivative nature of their claims—confirmed by counsel in briefing and at the hearing—is of dubious soundness. The Freys freely admit that their present claims are derivative and also recognize that the mechanism is less than sure. *See* DE 8 at 9 ("This claim is admittedly only a derivative one . . . . Kentucky law does not expressly provide for derivative actions in the nonprofit context."). Because Kentucky's highest court has not spoken definitively on the availability of nonprofit derivative claims, the Court must predict how that court would tackle the question. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001); *see also State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015) ("[T]he federal courts generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves.") (internal quotations omitted).

Kentucky law generally is at the least unclear about, and at the most opposed to, derivative claims in the nonprofit context. Kentucky statutes expressly grant derivative action claims for various types of business entities. *See* KRS 271B.7-400 (public benefit corporations); KRS 272A.13-010 (limited cooperative associations); KRS 275.337 (limited liability companies); KRS 362.511 (limited partnerships); KRS 386A.6-110 (statutory trusts). However, KRS 273—the statutory authority for operating nonprofit corporations in the Commonwealth—is suspiciously silent on the issue, despite several rounds of legislative tinkering in the area. Kentucky courts, the masters of Kentucky law, have noted the absence and, if they have not foreclosed the question altogether, they have left it on the brink. *See Brant v. Turpin*, No. 2018-CA-1074-MR, 2021 WL 1583152, at *5 (Ky. Ct. App. Apr. 23, 2021) (noting that the Kentucky legislature has included

8

derivative actions for several forms of business organizations but has not extended the same to the statutes governing nonprofits); *Porter v. Shelbyville Cemetery Co.*, No. 2007-CA-002545-MR, 2009 WL 722995, at *5 (Ky. Ct. App. Mar. 20, 2009) (stating that "nothing in KRS Chapter 273 governing nonprofit corporations expressly authorizes derivative actions by either members or directors" of nonprofits, but that other statutes expressly authorize them for other forms of business entities). If prediction is the name of the game in this setting, the odds heavily favor denial of a general nonprofit derivative action right.

Perhaps recognizing this weathervane's direction, the Freys lean on equity to prop up their theory. *See* DE 8 at 9–10 (arguing that the Court can recognize a nonprofit derivative action as an equitable matter, and that equity will provide the scope of relief) (citing Thomas E. Rutledge, *Who Will Watch the Watchers?: Derivative Actions in Nonprofit Corporations*, 103 KY. L.J. 31, 54 (2014–15)). First, at least one Kentucky Court of Appeals decision has already shut the gate on this theory. *See Thompson v. Lake Cumberland Resort Cmty. Ass'n, Inc.*, No. 2016-CA-000145-MR, 2017 WL 4712520, at *4 (Ky. Ct. App. Oct. 20, 2017) (declining to extend derivative actions in equity to nonprofits because binding precedent prevented the result and "Kentucky law does not provide, either statutorily or by case law, for a derivative action against a non-profit corporation"). Second, the transition from common law to positive law has long been in motion. Even if a court could, at one point in time, perceive a derivative cause of action originating only in equity, at the point where statutes now mostly rule the day, the Court cannot simply ignore the signals sent by the Kentucky Legislature's inaction in this area. The Freys come up largely empty-handed on authorities recognizing equitable derivative actions in the years of statutory prevalence. Though the Kentucky appellate decisions are not strictly binding authority, the Court would treat it as a mistake to ignore the consideration of judges charged with discerning and announcing the law in the Commonwealth. Judge Acree's struggles with the statutory sequencing in *Brant* does not

9

dictate the answer, but it surely illuminates some of how to think about Kentucky's relevant history, the recognition of derivative claims in some but not all positive laws, and imbedded clues regarding where the nonprofit action does or does not exist.

The strongest authority in the Freys' favor appears to be a minority opinion from Justice Noble, which implied that an owner of a condo could sue the managing council of the complex "by a derivative suit in the name and for the benefit of the Council."[3] *See Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 243 (Ky. 2013) (Noble, J., concurring in part and dissenting in part). However, Justice Noble cites only two out-of-state cases to support the proposition, both decades old, and an argument relying on the opinion has since been rejected by at least one Kentucky Court of Appeals. *See Thompson*, 2017 WL 4712520, at *4 (declining to credit plaintiff's argument relying on Justice Noble's dissenting equitable argument because the court considered the majority opinion binding on the issue). Here too, the majority opinion, which heavily undercuts the propriety of nonprofit derivative actions, is the viewpoint the Court hews to. *See Ballard*, 430 S.W.3d at 241 (noting that officers and directors of a nonprofit, to the extent they have a fiduciary duty, owe it only to the corporation, not to individuals).

To be sure, there may be a beachhead for *some* form of nonprofit derivative action, or a version of it, under Kentucky statutory and case law, but neither of the two narrow paths available

---

[3] Indeed, the Freys invoked this case, and one from 1903 as their "best cases" supporting a nonprofit derivative action, when prompted by the Court. As explained above, *Ballard* does not win the day. As for the citation to *Pittsburg, C., C. & St. L. Ry. Co. v. Dodd*, 72 S.W. 822, 828 (Ky. 1903), the Court agrees that the case cites reasoning for allowing a derivative suit, though plainly not in the nonprofit context. There are distinct policy questions that pertain to nonprofits, as other cases readily note. *See Doermer v. Callen*, 847 F.3d 522, 530 (7th Cir. 2017) (discussing, in rejection of derivative action by non-member, nonprofit oversight under Indiana law, the impact and policy choices behind potential derivative actions, the presence of Attorney General regulation, and unpersuasiveness of argument premised on a supposed right with no remedy: "The point is simply that the absence of a non-member director's derivative action would not leave memberless nonprofit corporations (like the Corporation here) without legal protection from wrongdoing by directors or others."). Kentucky similarly permits involuntary dissolution on the Kentucky AG's action when "[t]he corporation is guilty of abuse or misuse of its corporate powers[.]" KRS 273.320. Kentucky further empowers the Attorney General to enjoin unauthorized corporate acts under Chapter 273. *See* KRS 273.173(3). As the legislature has defined the field, the Court simply is not convinced that the derivative action exists, other than in the narrow areas Kentucky cases and the governing statutes indicate.

applies here. First, KRS 273.173, in the ultra vires context, allows "a member or director" to proceed against a nonprofit corporation to "enjoin the doing or continuation of unauthorized acts, or the transfer of real or personal property by or to the corporation." KRS 273.173(1). The same statute, in subsection (2), authorizes an action by "members in a representative suit" to proceed against officers or directors for ultra vires conduct. In a sense, these share commonalities with derivative suit principles, but the statute is confined as to participants and application.[4] This action is not a suit by a hospital member or extant director, and the claim is not, based on the complaint and hearing, that the actions taken were ultra vires, as that term is contemplated in the statute. Plaintiffs cite KRS 273.173 as authority nowhere in their papers.

Second, some relatively vintage cases suggest that a *member* of a nonprofit corporation may seek injunctive relief against the nonprofit's directors for failing to heed statutory or bylaw requirements. *See, e.g.*, *Hollins v. Edmonds*, 616 S.W.2d 801, 803 (Ky. Ct. App. 1981) (permitting church members to bring claim for injunctive relief against church directors for failing to hold yearly business meetings and noting that "any active member of the corporation can seek relief in the courts from the directors' refusal to hold a meeting"); *Willis v. Davis*, 323 S.W.2d 847, 848 (Ky. 1959) (allowing action for injunctive relief brought by members of a church compelling the church's pastor to hold monthly business meeting in compliance with the church's bylaws). Those and later cases, however, restrict the right to members (not directors) suing on behalf of the corporation to bring to heel a rogue officer or director. *See, e.g.*, *Porter*, 2009 WL 722995, at *5 (seeing "no authority to recognize the right of a corporate director . . . [to] bring[] an action on behalf of the nonprofit corporation . . . for the sake of its member); *Thompson*, 2017 WL 4712520,

---

[4] *See also Fanning v. John A. Sheppard Mem'l Ecological Rsrv., Inc.*, No. 2:18-CV-01183, 2020 WL 597422, at *3 (S.D.W. Va. Feb. 6, 2020) (discussing West Virginia statute that allows derivative claim only in the ultra vires context: "Other than expressly authorized in West Virginia Code § 31E-3-304(b)(2) ("Section 304"), West Virginia state law does not authorize derivative actions for state law claims brought on behalf of West Virginia nonprofit corporations."). The West Virginia statute is a close parallel to Kentucky's ultra vires statute in the nonprofit chapter, KRS 273.173.

11

at *4 (limiting any potential derivative action under KRS 273.215 and .229 to one maintained by "a shareholder/member seeking redress for violations thereunder"); *Fenley v. Kamp Kaintuck, Inc.*, No. 2010-CA-001926-MR, 2011 WL 5443440, at *2–3 (Ky. Ct. App. 2011) ("We are convinced that continuing membership in a nonprofit corporation is an absolute requisite to maintaining a derivative action."). AAG, the *sole* member of PCHC under the current bylaws, is not a party to this case, let alone a plaintiff. Thus, these cases, to the extent they recognize some form of nonprofit derivative action by a member for injunctive relief, simply do not apply to the Freys or their putative case.[5]

All that said, even assuming they showed procedural success likelihood through a derivative vessel, the merits of the Freys' three claims leave the Court with doubts that easily foreclose an injunction. As to the $7 million transfer, Defendants largely filled the gaps of supposed impropriety with plausible bases in contract to support the transfer. The Defendants tendered the Credit Agreement, never referenced by the Freys in their pleadings, which contains provisions colorably allowing protective actions by PCF, relative to its collateral, in the event of PCHC's default. *See* DE 11-6 at 59–63; 74–76. The Defendants also provided facially reliable information that PCHC was in default of at least one of its central obligations at the time of the transfer, triggering the Credit Agreement's default provisions. *See* DE 11-18 at 7 (noting that PCHC was in default of financial covenants and insurance covenants and was provided notice of a default on $2.5 million loan from First State Bank just prior to the transfer); DE 11-6 at 59–63, 74–76 (allowing, in the event of default, with or without notice or demand, for PCF to take various protective measures in the event of PCHC's default). Michael Frey agreed that First State Bank called its sizable loan and demanded payment. Of course, the Freys dispute motive, propriety, and

---

[5] *See also* FED. R. CIV. P. 23.1 (extending derivative action only to "shareholders or members of a corporation"). The Freys repeatedly reference their "personal" rights and stake in relief, but the Court will not spend ink on assessing theories and claims not within the pleadings.

the details of the transfer. They bombastically call the transfer a theft of funds. The Court is not persuaded by the overheated rhetoric and notes that PCF's rights turned then and turn now on contract. The Court does not resolve those issues here. It merely notes that Defendants have plausibly countered, initially, the Freys' pernicious allegations.

For all of the nefarious references, the Court notes that the hospital was on the verge of closure in early 2023. Contemporaneous board consents, *see* DE 11-3, from February 2023 reference the hospital's "exigent circumstances relating to its imminent insolvency." *Id.* at 2. The prior Board existed at the time of the Credit Agreement and for months after—signifying awareness of and participation in the heavily negotiated funding steps. Michael Frey was around but clearly not at the table. Given that Michael testified as a supposed insider and yet plainly was not privy to many of the key machinations put in place in early 2023,[6] his later-developed suspicions come with a large grain of salt. What the Court sees is a lender with significant potential exposure and strong contractual rights. One of the hospital's key credit lines came due and could not be resolved. The default at First State Bank put the hospital's accounts at risk, so PCF took steps under Section 8 to protect the collateral and resolve issues with that lender. Maybe that was proper and maybe it was improper per the contract mechanics, but the Court, which has reviewed the Credit Agreement's applicable definition sections, the sections on default and remedies, and the sections on collateral, does not see a clear or sufficient likelihood of success for the Freys.[7]

As to the Freys' wrongful ouster claims, the current PCHC bylaws, tendered by Defendants and supported by uncontested affidavits, provide sufficient clarity. KRS 273 places heavy emphasis on a nonprofit's bylaws. And where those bylaws call for a certain result, they normally

---

[6] And those mechanics were largely confidential, as a matter of contract, in early 2023, as agreed to by both the incoming lender and the outgoing board. *See* DE 11-2 (including requirement of confidentiality, nondisclosure, and noncircumvent). Much of Plaintiffs' complaint and initial brief shows ignorance of the underlying transactions and governing documents.

[7] And the Freys note that $2.5 million of the $7 million got paid back into the hospital in 2024, *see* DE 8 at 3, further thinning the factual force of the defalcation theory.

13

govern. *See* KRS 273.191 (corporation may use bylaws to regulate and manage affairs so long as they are "not inconsistent with the law or the articles of incorporation"). Here, the February 2023 amended bylaws endorse the present structural result. They empower the sole member, AAG, to appoint the Board, *see* DE 11-5 at 4, which then votes on officer hiring decisions, *see id.* at 5. The bylaws provide "full decision-making authority" on any member-dedicated topic, including decisions "to hold any office or appoint members or Agents at its sole discretion." *See id.* Does that extend to removal of the Board, per KRS 273.211(4)? That question might be debated, textually, but the hospital's own practices are informative. Thus, the very basis for Natalie Frey's original Board membership lies in the structural changes implemented by Richter in April of 2023. There, acting per the amended Bylaws, Richter unilaterally deposed the prior Board, named new members, and designated a chair. *See* DE 11-4. Surely, this implementation history, which no one claims was improper, sheds light on the meaning of the member's authority relative to the Board under the bylaws language, demonstrating some removal authority as subsumed within appointment power. The Court does not see a clear likelihood of success on the question of Board member or officer removal.[8]

The Freys' merits arguments also feature an underlying (and undeveloped) current of conflict-of-interest allegations. They argue that a conflict of interest would have tainted any vote to terminate Michael Frey as CEO because it must have been motivated by "self-preservation" to insulate Varghese and Richter from exploration of their wrongdoing. *See* DE 8 at 5–6, 8, 11. The notion of a conflict of interest shows up only once in KRS 273. Under 273.219, a conflict-of-interest transaction arises when an outside party, in which a director has a direct or indirect interest, transacts with the nonprofit. *See* KRS 273.219. In that case, the statute lays out certain disclosure

---

[8] Regarding the duration of Richter's authority as member designee, the Court has doubt that such an argument is Plaintiffs' to make. The single member is not here as a party stating any objection. Further, documents such as the Credit Agreement suggest an open-ended designation. *See, e.g.*, DE 11-6 § 9.01 (listing Richter as "Member Representative" entitled to notice to borrower).

14

and fairness provisions to ensure reasonable dealing. *See id.* That situation is inapplicable here. Indeed, the Freys do not cite this provision, nor any other authority, and rely on general notions of "manifest conflicts of interest." *See* DE 8 at 8. This view—that any seemingly self-interested board action must be void—stretches the notion of a conflict of interest far too thin. The Freys do not offer a single case to support the point, let alone one mirroring these circumstances. And the Court, for what it's worth, cannot find any. KRS 273.219 at least makes clear that the phrase maintains a particular meaning in this context, and the Court is not at liberty to expand that meaning on a whim.[9]

Likewise, nothing indicates that KRS 273 envisions a structure where any level of self-interested action leaves a nonprofit board impotent or frozen. Indeed, as to the particular issue of Michael Frey's removal, the section provides that an officer may be removed where it is believed to be "in the best interests of the corporation," and gives no mention of self-interest or conflicts of interest. *See* KRS 273.231. If the answer were otherwise, the interrelation of the parties would have prevented, on conflict grounds, an untold number of actions normally within the Board's purview. This is especially troublesome where, as here, an outside lender takes effective control of a nonprofit board by agreement. If self-interest sidelined all action, then presumably Varghese and Richter would be conflicted out of almost any board action, given the likelihood that what the Board perceives as good for PCHC will also be good for PCF, KMM, and AAG. Could Richter have appointed Varghese, the head of PCHC's new lender, as Board Chairman under this standard? Likely not. Indeed, could Natalie Frey have voted to hire her husband as PCHC's CEO under this standard? Almost certainly not. But the Freys, conveniently, challenge neither of these actions.

---

[9] To the extent there is any suggestion that the Credit Agreement was improper, under these concepts, the prior Board was fully involved in the resolution of the hospital's financial woes in early 2023. Further, that PCF as a lender had significant control over the entity seems to mirror the structure in place prior to 2023, when First State Bank controlled the Board. Michael Frey referenced that Bank as the prior hospital "owner," and an owner surely has decisional control despite the self-interest that inheres in ownership.

15

Lacking authority and logic, the Freys' conflict of interest arguments, as a means of invalidating interim governance steps at the hospital, fall flat.

On procedural and merits grounds, the Freys have not, per the referenced standards, demonstrated they are likely to succeed on the merits of their claims.

### b. Irreparable Harm

To justify a preliminary injunction, an injury must be both "certain and immediate" and not "speculative or theoretical." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Issuing a preliminary injunction based only on a "possibility" of irreparable harm contradicts the nature of injunctive relief as an "extraordinary remedy." *See Winter*, 129 S. Ct. at 375–76. Following that thread, the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. *See Griepentrog*, 945 F.2d at 154.

The Freys' irreparable harm allegations come in three general forms. First, they allege that the hospital will face severe detrimental effects in their enduring absence. *See* DE 8 at 12. They point to the hospital's turnaround under their tenure and surmise that these positive changes will fall by the wayside but for their leadership. *See id.* Second, they allege that the $7 million transfer caused irreparable harm to the hospital's finances, and that without an injunction, the hospital may not be able to "stay afloat." *See id.* at 10. Finally, they claim that Defendants' alleged withholding of pertinent financial materials will cause irreparable harm, as Medicare will cease reimbursement payments to PCHC (imperiling nearly 90% of the hospital's revenue stream) if the 2024 Medicare cost report is not filed. *See id.* at 11–12; DE 13 at 9.

The Freys' first ground for irreparable harm is the exact type of harm cases caution against relying on in the preliminary injunction setting: speculative and theoretical. The Freys provide nothing concrete about what detrimental effects their absence will have on PCHC. They contend,

16

in briefing and through hearing proof, only general notions of worsening morale, increased turnover, and the like. *See* DE 13-10; 13-11; 13-12. Perhaps most telling, the Freys have not shown any concrete way the hospital has declined in the months since their departure. And general notions of compromised morale or lowered productivity, absent verifiable evidence suggesting the truth of those assertions and the scope of its detrimental effect, are far from irreparable. *See Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (noting that "an injury must be certain, great, and actual" to constitute irreparable harm) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Both sides here have their champions and detractors, but Plaintiffs have not successfully depicted the Freys (a single prior Board member and a person not hired as CEO until April 2024) as required ingredients for hospital survival. As de Gaulle once observed, "The graveyards are full of indispensable men."

The Freys' second theory of harm—that PCHC is left financially vulnerable without immediate return of the $7 million transfer—is sharply enervated by the timing of the transfer and the course since. It is undisputed that the transfer occurred in November 2023—nearly 14 months ago and before Michael Frey's entire tenure as CEO of PCHC. *See* DE 11-13. Since then, the hospital has shown no serious signs of financial instability—a point the Freys credit to their handiwork—and evidence shows that during the 14-month period since the transfer, the hospital has generally met its ongoing obligations in payroll, contracts, and the like as a going concern.[10] If direct control of the $7 million were truly a make or break line item in the hospital's ledger, it would follow that some financial difficulty should attend its absence. A dispute over $7 million is important, surely, but not irreparable on this record. Per the Freys' telling, the hospital flourished under Michael Frey's leadership, during a period that was post-transfer, so it is hard to sell that

---

[10] Susan Scott, PCHC's former Human Resources Director testified that, as a general matter, PCHC had been able to meet its financial obligations in the past year, up until her termination in late 2024.

17

preliminarily arresting control of the at-issue collateral is the sine qua non of hospital survival. The proof is not there on that point.[11]

Finally, the Freys' concern surrounding PCHC's 2024 Medicare report appears largely overblown. At the time of the evidentiary hearing on this motion, PCHC's 2024 report, due at the end of November 2024, remained unfiled. In isolation, this fact is concerning. But when compared to the timing of last year's Medicare Report, the situation emerges as far less dire. An uncontested point, PCHC filed its 2023 Medicare Report, under Michael Frey's tenure, in May of 2024—six months after the due date. By that time, Medicare had paused payment and reimbursement to the hospital pending the report, and once the report was filed, payments resumed without issue, including retroactive reimbursement for the paused period. As for the 2023-24 report, all signs show that the filing will follow a similar if not timelier path, with Defendants asserting the filing will occur even sooner than last year. *See* DE 11 at 23. And in any event, nothing suggests that anything other than a brief pause with subsequent reimbursement will result as the delay repeats. The point, still the same, is that the Freys offer no reason to believe that the current delay will result in certain and immediate financial distress for PCHC. Again, potentially harmful, but not likely irreparable on this record.

### IV.  Conclusion

The Court will not attempt to sift the many haymakers launched by each side. The question here is the Freys' demand for an injunction, an extraordinary remedy that would reconstitute hospital governance, arrest prior hospital accounts, and micromanage the hospital's Medicare reporting.

---

[11] And where are the other lenders, which surely would be acting protectively if they saw a (presumably) junior lender absconding with $7 million and rendering the hospital insolvent or inoperable?

The Freys' injunction showing suffers critical lacunae at the first two Rule 65 factors. Given the Court's conclusion that Plaintiffs have not shown clear likelihood of success or irreparable harm, the Court sees no need to vet the remainder of the test. The Court rejects the Rule 65 showing and **DENIES** DE 8.

This the 22nd day of January, 2025.

Signed By:
*Robert E. Wier*
United States District Judge