```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
 2                 SOUTHERN DIVISION at LONDON
                            - - -
 3
    MICHAEL & NATALIE FREY,      : Docket No. 6:24-cv-178
 4  On behalf of PINEVILLE       :
    COMMUNITY HEALTH CENTER, INC.,: London, Kentucky
 5                               : Friday, January 10, 2025
                    Plaintiffs,  :
 6                               :
                                 :
 7  versus                       : 9:00 a.m.
                                 :
 8  DENNIS VARGHESE, ET AL.,     :

 9                  Defendants.

10                          - - -
          TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION
11                  BEFORE ROBERT E. WIER
             UNITED STATES DISTRICT COURT JUDGE
12                          - - -
    APPEARANCES:
13
    For the United States:     CHADWICK McTIGHE, ESQ.
14                             BRIAN BUTLER, ESQ.
                               RACHEL GUMBLE, ESQ.
15                             Stites & Harbison
                               Suite 1800
16                             400 West Market Street
                               Louisville, Kentucky  40202
17
    For the Defendant:         DONALD KELLY, ESQ.
18                             Wyatt, Tarrant & Combs
                               Suite 2000
19                             400 West Market Street
                               Louisville, Kentucky  40202
20
    Court Reporter:            KIMBERLEY KEENE, RMR
21                             Official Court Reporter
                               Room 317
22                             310 South Main Street
                               London, Kentucky  47041
23                             (606) 877-7968

24      Proceedings recorded by mechanical stenography,
    transcript produced by computer.
25
```

1     (Proceedings commenced at 9:00 a.m.)

2     THE COURT:  Okay.  Thank you so much.  Good morning

3  to everyone.

4     If the clerk would call the next matter.

5     COURTROOM DEPUTY:  Yes, Your Honor.

6  London Civil Action Number 6:24-cv-178.

7  Michael & Natalie Frey on behalf of Pineville Community

8  Health Center, Inc., versus Dennis Varghese, et al.

9     THE COURT:  Thank you very much.

10  Counsel, good morning to you.  Let me start by having you

11  state your appearances and tell me who you have with you

12  today.

13     MR. McTIGHE:  Good morning, Your Honor.

14  Chad McTighe on behalf of the plaintiffs.  With me on my

15  right are my colleagues Brian Butler and Rachel Gumbel, both

16  counsel, as well.  And the Freys are sitting here bind me.

17  Mike and Natalie.

18     THE COURT:  Thank you.  Good morning to all of you.

19     For the defendant.

20     MR. KELLY:  Donald Kelly on behalf of the defendant,

21  and present in the courtroom the Vargheses.

22     THE COURT:  Thank you.  Good morning to all of you.

23     Okay.  The plaintiffs are here on a motion seeking the

24  extraordinary remedy of a preliminary injunction.  I have

25  carefully read the Verified Complaint, the motion, the

1    response, the reply.  I've also looked at the motion to

2    dismiss briefing; that's not quite ripe.

3        I've surveyed all of the exhibits and gone through them

4    with as much detail as I had time to do.  I can't claim to

5    have fully digested the 50-page, single-spaced financing

6    agreement.  But I've certainly gone through all of the

7    exhibits, and I've looked carefully at all of the

8    affidavits.

9        So the plaintiff has the burden here.  We are going to

10   get this hearing in this morning, that's why I kept it today,

11   despite the incoming weather.  So we'll stay on track for

12   that.

13       What does the plaintiff have to offer in terms of proof?

14       MR. McTIGHE:  Thank you, Your Honor.

15       Your Honor, I think that we certainly want to be most

16   helpful for the Court in the making decisions, so we are

17   certainly receptive if you have questions for counsel that you

18   wish to raise with us; otherwise, we do have Mr. Frey in

19   particular to testify.

20       There are other individuals who can offer testimony, if

21   needed.  Obviously, we don't want to be redundant of what has

22   been filed, but we certainly think that it makes sense that

23   Your Honor gets to see and hear it straight from the horse's

24   mouth.

25       And Mr. Frey can come up here and we can ask him a few

1    questions.  Again, as counsel, we're happy to offer argument,

2    commentary or, more importantly, address any questions that

3    you may have on any of the issue that we may raise.

4         THE COURT:  Okay.  I certainly will have some

5    questions.  I don't micromanage the way a party chooses to try

6    to prove its case.  So if you want to put on proof, I'm glad

7    to receive what you want to put on today within the temporal

8    confines of the hearing.

9         To the extent you want to stand on the record, you know,

10   that's certainly your call.  The rules of evidence don't apply

11   in this context.  So I don't -- it doesn't have to be proof

12   admissible at a trial.  You know, that doesn't mean that all

13   hearsay has the same weight or persuasiveness.  So I'll let

14   you decide.

15        If you want put to on some proof, go ahead.

16        MR. BUTLER:  Your Honor, I think we would.  I think

17   we may just as well start with Mr. Frey.

18        If we can call him to the stand, please.

19         MICHAEL FREY, PLAINTIFF'S WITNESS, SWORN

20        THE COURT:  Very good.  If there are nonparties,

21   folks in the courtroom who might be called, I wonder if --

22   there may not be anybody in that category -- it might be

23   prudent to have those people wait outside.

24        MR. McTIGHE:  Could we have one second, Your Honor?

25        THE COURT:  Sure.  Okay.

1          Thank you.  That again, we're not really under the rules,

2     but that just makes sense in terms of quality of the proof.

3          Good morning, sir.

4               THE WITNESS:  Good morning.  How are you?

5               THE COURT:  I'm good.  Would you first state your

6     name and spell your last name?

7               THE WITNESS:  Michael Frey.  F-r-e-y.

8               THE COURT:  Mr. Frey, that mic will move, the seat

9     won't move as easily.  Try to speak toward that mic in a clear

10    voice so we can all hear you.

11         You can proceed, counsel.

12              MR. BUTLER:  Thank you, Your Honor.

13                         DIRECT EXAMINATION

14    BY MR. BUTLER:

15    Q.   Michael, can you just kind of -- given our time

16    constraints here, sort of cut to the chase here.

17    A.   Sure.

18    Q.   Can you tell the Court when you became the CEO of

19    Pineville Hospital, please, sir?

20    A.   It was the latter part of last year, in 2024, around

21    August of 2024.  We had had two CEOs prior to that.  The model

22    that we are implementing for the hospital was rather complex,

23    if you will, and so we felt that it was probably better that

24    somebody who knew the model inside and out take over and kind

25    of take the reins.

1    Q.   Prior to you becoming the CEO, can you tell the Court

2    when you first became affiliated with Pineville Hospital?

3         I believe that was in 2019, correct?

4    A.   Well, actually, it was a little bit before that; but,

5    yes.  I -- at the time, I had a company called Diversified

6    Medical Management and our general counsel had a business

7    acquaintance that was into -- or looking to get into buying

8    rural health hospitals, trying to turn those around, prevent

9    closing.  That is a rampant issue across the country right

10   now.

11        And so they asked me to come in, kind of evaluate the

12   hospital, see what we could do to help.  They were just

13   purchased by a separate entity.  We met three or four times.

14   The entity that purchased the hospital, their vision was a

15   little different than ours.  Their's was more lab oriented,

16   ours was more community based.

17        So at that time, we decided that the -- the venture

18   probably wasn't going to work just because, just being frank,

19   we really weren't interested in developing a huge laboratory.

20        We had multiple lines of revenue and service lines that

21   we wanted to implement as part of the model, so we walked away

22   from it at that time.

23   Q.   What year was that, just for the Court's edification?

24   A.   That was in 2018.

25   Q.   Okay.

1    A.    In 2018.  So after -- shortly after that, the company

2    that purchased the hospital filed for bankruptcy and the

3    hospital was bought by a local bank to try to keep it open for

4    the community.

5          I had built a very strong rapport with the local

6    community there, so they reached back out to me and asked me

7    if I would come back up there to implement the model and try

8    to revitalize the hospital, and that's when the conversations

9    began about how we ended up where we are today.

10   Q.    And you mentioned a -- just a clarification.  You

11   mentioned a local bank.

12         Was that First State Bank?

13   A.    That was First State Bank, yes.

14   Q.    And then you said that you were contacted by people in

15   the community to consider coming back to Pineville Hospital?

16   A.    Yes.  We were contacted by Katherine Reece and Ken Jones

17   who owned the bank, so by virtue they owned the hospital; and

18   then, the city council reached out to us as well and asked us

19   to come back up there and see if we could try to get the

20   hospital going in the right direction.

21   Q.    And this would have been what year now?  You said you had

22   some involvement in 2018.

23   A.    This is the end of 2022.  I mean, literally, November,

24   December of 2022, that's when the negotiations began.

25         Initially they called and wanted us just to implement the

1    model.  Then I got a call from Katherine.  She said, you know,

2    really, what we would be willing to is a debt assumption and

3    sell it.  We are not healthcare people; we're bankers.  And

4    she asked me, Do you know anybody that would be interested in

5    going in with you to purchase the hospital.

6         So that's when Dennis and I started talking about that

7    opportunity, and I was kind of the go-between.  Dennis was

8    offsite.  I was onsite probably twice a week during that time

9    trying to negotiate both sides, mediate between both sides.

10   There was some give and take from both sides; and I was, more

11   or less, the liaison that kind of held it together until they

12   could come to an agreement in a final standing.

13   Q.   When you say "Dennis," you're referencing Mr. Varghese?

14   A.   Yes.

15   Q.   Sitting behind counsel table, correct?

16   A.   Yes.

17   Q.   If you could, give the Court -- at least from your

18   understanding from speaking with Mr. Jones and others in the

19   Pineville community -- what was the financial situation of the

20   hospital in late 2022 when you were approached about coming

21   back and implementing your model of running the hospital?

22   A.   Well, it was pretty cut and dry.  They explained to me

23   that there was --

24        MR. KELLY:  Your Honor, just object to the hearsay.

25   I understand that the official rules --

1          THE COURT:  As I've said, the rules of evidence don't

2     apply.  So you can make your points on cross about weight, but

3     I'm going to hear what he's got to say.

4          MR. KELLY:  That's fine.

5          THE WITNESS:  There was $8,000,000 in debt; 4.5

6     million to the USDA, 2.5 million to a line of credit that the

7     bank had previously loaned the hospital to keep it afloat;

8     there was a $1,000,000 economic development loan associated

9     with that, as well, which that's where the $8,000,000 came

10    from.

11         So the terms that we came to was that we would assume

12    that debt, refinance that debt within 90 days, and -- and

13    then, at that point, move forward from there.  So that was --

14    essentially, it was a debt assumption is what it was.

15    BY MR. BUTLER:

16    Q.   Now, were you part of the actual -- what was your -- were

17    you part of the group that was doing the -- supposed to do the

18    refinancing to assume this debt?

19    A.   On the financial end, no, sir; not on the financial end.

20    I was on the, more of the operational, business development

21    side.

22         And keep in mind, Pineville knew what they were getting,

23    so they knew what my plan was going to be, they knew it was

24    going to be a quick turnaround.  I told them that it would be

25    a 90-day turnaround and we would be cash flowing and we were

1    right there in that ballpark.

2         So from the financial side of it, it was not an

3    investment on my part; so, no, I'm not taking credit for that

4    at all.

5         But it was my wife and I together, implemented the plan

6    and it worked perfectly, exactly how we told them it would.

7    Q.   Now, going back to this point in time at late 2022, early

8    2023 when Mr. Varghese is involved, you have brought him in as

9    a potential financier.

10        In, I believe it's Defendant's Exhibit No. 1, that's an

11   iMed document, and it's an agreement from January 30th of

12   2023, and it references that there is $700,000 that is being

13   infused.

14   A.   Yes, sir.

15   Q.   Okay.  Can you explain what that was for, how that was

16   used, if it was paid back?

17   A.   It was actually going to be bridge money until -- until

18   the model kicked in.  Already had the players in place for the

19   new lines of business ready to implement.  It really came down

20   to a matter of agreeing on contracts with those providers.  We

21   were able to do that.  And like I said, we hit our target

22   goal.  It was exactly what we told them we would do.

23   Q.   Now, when you first were brought into this, if you could

24   explain to us what the -- what your understanding of the

25   financial arrangements were and the compensation you would

1    get, what everyone's role in this, be it Mr. Varghese,

2    Ms. Richter, your wife, please?

3    A.   Well, my wife and I actually developed the model.  We did

4    that years ago.  We had done it successfully in other

5    hospitals.  Mr. Varghese was going to put up the bridge money.

6    It was 700,000.

7    Q.   Okay.  That's what I was going to ask you, make sure we

8    understand.

9         700,000 was going to be put up by Mr. Varghese?

10   A.   That's correct.  That's correct.

11   Q.   Go ahead.  I'm sorry.

12        When you are saying "Mr. Varghese," do you mean him

13   individually or a company he was part of?

14   A.   Sadly, I don't know the answer to that because we were

15   told multiple things.  I was told that he was putting the

16   money up, and then when it came time to laying out the

17   ownership structure, it was explained to us that 33 percent of

18   ownership went to Natalie, 33 percent went to Dennis, and

19   33 percent went to what he called the money, quotations.  But

20   there was never a name mentioned.

21        So Ms. Richter, her name was never brought up until

22   months down the road.  We had no idea that she was even part

23   of the deal.

24   Q.   So at the beginning you've talked a little bit -- and I

25   think it's probably a good time to have you explain this.  You

1    used the term "model" a couple of times about you

2    implemented -- you and Natalie implemented your model at the

3    hospital.

4        What was -- and we don't have hours and days to do

5    this -- but can you explain in a nutshell for the Court what

6    that model was and what the plan was to turn the hospital

7    around?

8    A.    Absolutely.  What you do when you go into -- and in the

9    interest of time, I'll make this quick.

10       Each hospital is different.  So if you're not in the

11   healthcare field and understand how to dissect what each

12   community needs, it's not like you're doing business in

13   Nashville or Louisville, you're doing it in small rural towns,

14   so you have to really examine and kind of dissect what that

15   particular community needs.

16       For instance, part of the model was, there was no

17   diabetic care in Pineville, in the city of Pineville; so we

18   looked at that and said, well, okay, demographically if you

19   look at -- at what's available, most of the patients were

20   having to drive 60 miles, so we immediately said, okay,

21   diabetics needs to a part of -- diabetic care needs to a part

22   of this model.

23       We had a nursing home platform where we contract with a

24   company.  They go into the nursing homes, they provide medical

25   and psychiatric rounds for the patients.

1      And what that does is that enhances and expands your

2      outpatient program.  That is a very very huge piece of the

3      puzzle of this because in these small towns, you can't sit

4      around and wait on car accidents and heart attacks to happen.

5      You have to go out and get the business and bring the business

6      to your building.  We were able to do that through our

7      network.

8      And so we were able to expand the outpatient visits for

9      Pineville Community Health Center by almost 8,000 visits a

10     month in our first 90 days.

11     So we looked at the overall big picture on what this

12     community needed.  We knew that it was infiltrated with

13     substance abuse, and we knew that the youth of the community

14     had no options.  They had no resources.  That was another

15     program that we wanted to implement.

16     So we had what's called an intensive outpatient program.

17     A lot of times people will kind of correlate intensive

18     outpatient with just substance abuse, but it's much -- it's

19     much deeper than that.  It's anger management classes, it's

20     parenting classes, it's talk therapy for children who live in

21     homes where abuse is rampant or, you know, they're going

22     through a divorce and the child's acting out.  And so what we

23     do is we become somewhat of a counselor, I guess in layman's

24     terms, for them.

25     So to answer your question:  Each community is different,

1    but the basics of it are pretty much the same.  You want to

2    look at that community, see what they need.

3        We were very very familiar with Pineville.  Pineville has

4    been through the ringer, to say is the least, and they always

5    had a special place with Natalie and I, that's why we continue

6    to go back there, because we knew that we could help those

7    people and we had known them over the years.  We had grown to

8    know them.  So we had a real dire need to help them.

9        And when we agreed to do that, they welcomed us with open

10   arms and we jumped right in and did what we told them we were

11   going to do.

12       Do you have some water, by any chance?

13           THE COURT:  We'll get you some.

14           THE WITNESS:  Sorry about that.  I know time is --

15   thank you so much.  I appreciate that.  I apologize.

16   BY MR. McTIGHE:

17   Q.  That's okay.

18           THE COURT:  Your entitled to be thirsty.  No apology

19   needed.

20           THE WITNESS:  I've been battling the flu all week, so

21   I'm just trying to get my throat wet.

22   BY MR. BUTLER:

23   Q.  So this -- so you guys, you're in.  You said that the

24   hope or the expectation was to start turning a profit, or at

25   least positive cash flow, within 90 days.

1    Can you tell the Court how that progressed from -- I'm

2    specifically going to late January, early February of 2023,

3    after of this money has been infused, to your role in trying

4    to turn the hospital around?

5    A.   Well, to be quite honest with you, it was really turned

6    over to Natalie and I and staff.  The staff deserves as much

7    credit as Natalie and I do on -- on making this thing

8    successful.

9        Dennis identified himself as the financial guy and that

10   he would be in control of all financials that were related to

11   the hospital.  We were more feet on the ground, head down,

12   let's get to work.

13       The hospital was so outdated.  It was, you know -- and

14   even still there's things that -- that are not being done,

15   that have not been done that -- that are -- it's just actually

16   quite sad that it hasn't been done.

17       But we were more feet on the ground, let's go make it

18   happen, let's continue to build the business.  We built a

19   reputation in the community.

20       We did a number of things.  We had -- the first line of

21   business for us, actually, was to repair the reputation of

22   Pineville Community Health Center.  They had a reputation for

23   not paying their bills; they had a reputation for, you know,

24   lack of care and the quality of care.

25       So what we did is we kind of engulfed ourselves in the

1    community, went around introduced yourselves to those who

2    didn't know us.  You know, essentially made promises that we

3    put our own feet to the fire, and we were able to fulfill

4    those promises to them.  But we were more active in running

5    the hospital.

6         I think Dennis has been there three times in two years

7    after Sheryl twice.  So we literally moved our family to

8    Pineville, moved our son and had him home-schooled at the

9    hospital so that we could be there full time to take on the

10   burdens that came with...

11        You know, when we actually introduced yourselves and told

12   people we have taken on this hospital, sometimes people looked

13   at us like, you know, we had four heads.  They're like, What

14   are you doing, but that was the challenge that we wanted, that

15   was the challenge we accepted, and that's the challenge we

16   accomplished.

17   Q.   Specifically, when did the hospital start going into the

18   black after -- I want to say early February 2023?

19   A.   I want to say -- I would say by May, by May, probably mid

20   May, somewhere in there.  It was running pretty heavy.

21        That's --

22             THE COURT:  May of '23?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Yep.

25             THE WITNESS:  Yes.  Yes, sir.

1    BY MR. BUTLER:

2    Q.   Now, I'm going to start turning to some of the more

3    important questions of this.

4    A.   Sure.

5    Q.   Can you tell the Court, based upon your time there,

6    approximately what percentage of the revenue of that hospital

7    comes from Medicare/Medicaid?

8    A.   It's roughly, I would say, between 88 and 90 percent

9    probably.  I'm actually very confident in that.  It's -- in

10   these type of areas, that's predominately what you're going to

11   get.  You're going to get straight Medicare.  You're going to

12   get heavy Medicaid in those areas, as well, just due to the

13   demographics and socioeconomic status of each community, so...

14   Q.   Prior to the filing of this lawsuit, had you ever seen

15   the credit agreement that the Court referenced?

16   A.   No, sir.  As a matter of fact, we were told that we were

17   part of a company called Kentucky Medical Management.  We went

18   back and looked, documented over 50 requests for documents

19   that showed the ownership as it was explained to us, which was

20   33 percent to Natalie, 33 percent to Dennis, 33 percent to

21   "the money."

22        It wasn't until May of '24 that we understood that

23   Ms. Richter was the other 33 percent when, during the

24   festival, when the festival took place and she came into town.

25   Q.   Prior to the filing of this lawsuit -- in fact, not just

1    prior to this lawsuit, prior to the response filed by the

2    defendants in this case, were you aware that this credit

3    agreement had been signed by Ms. Richter --

4    A.   No, sir.

5    Q.   -- and Mr. Varghese behalf of a for-profit company

6    Payroll Card Formula?

7    A.   No, sir.  As a matter of fact, the paperwork that was

8    submitted to us was pages 1 through 3.  It wasn't until they

9    filed their response that we even knew there were additional

10   pages added to that.

11   Q.   Were you aware, prior to the response of the defendants

12   in this case, that this credit agreement that was reached

13   between Ms. Richter and Mr. Varghese called for 1.5 million

14   up-front fee just to start?

15   A.   Absolutely not.

16   Q.   Were you aware that Mr. Varghese's company, Payroll

17   Credit Formula, had signed a ten-year note where they get a

18   million dollars a year whether they loan a penny or not to the

19   hospital?

20   A.   Absolutely not.  And I actually saw no reason for that.

21   The hospital was flourishing, there was -- no.  In short, the

22   answer no.  Absolutely not.

23   Q.   Prior to the response of the defendants, were you aware

24   that if the hospital, through Ms. Richter, were to try to

25   terminate this credit agreement, that they would owe penalties

1    of a million and a half, or a million, or 500,000, depending

2    upon what point in time that this credit agreement was ended

3    by the hospital?

4    A.   No.  No businessman with half a brain would agree to

5    that.

6    Q.   Were you aware that Mr. Varghese's company, if they did

7    loan any money to the hospital, would get 18 percent interest?

8    A.   No.  That was all withheld from us and the whole entire

9    community.

10   Q.   As a businessperson, have you ever signed a credit

11   agreement to pay four times prime?

12   A.   No, sir.

13   Q.   In your business experience, does that make any sense?

14   A.   No, sir.

15   Q.   Was there any need, by April, May of 2023, to have -- pay

16   a credit company a million dollars a year just to be out there

17   in the event you might need money?

18   A.   No, sir.

19   Q.   And to your understanding as CEO, were you in the black

20   by then?

21   A.   We were, if -- I want to make sure that I'm -- that I'm

22   certain in my answers.  So I want to say that I can say that

23   we, essentially, 100 percent were on the verge, if not already

24   there.

25   Q.   Have you ever, at any point in time -- I think up to this

1    moment -- ever seen a refinancing agreement where Pineville

2    Hospital -- or where the Payroll Credit Formula assumes that

3    debt that you all discussed at the beginning of your

4    involvement in Pineville Hospital?

5    A.   No.  And after speaking with accounts payable and looking

6    into it myself, none of that debt was every refinanced.

7    Q.   So we talked about at the beginning of your testimony

8    that there was a $4.5 million debt to USDA when you became

9    involved in the hospital, again, in late 2022.  You all began

10   those negotiations.

11   A.   That's correct.  Even though I was not officially the CEO

12   at the time, I took over those meetings with the creditors.

13        Creditors became quite frustrated because the CEO at the

14   time was providing financials to them as -- as demanded in --

15   in the contract agreement, in the loan agreement.

16        I was instructed not to the turn over financials to

17   anybody.

18   Q.   Who instructed you to do that?

19   A.   Mr. Varghese.

20   Q.   So let's start with this USDA debt of $4.5 million.

21        Can you tell the Court how that was being paid back?

22   A.   It's an ACH debit.  It's been paid that way for years.

23   It's, I believe, $22,000 a month.

24   Q.   And what account?  Was that coming from the hospital

25   operating account?

1   A.   Operating account.  Yes, sir.  First State Bank at the

2   time.

3   Q.   So from the time that you get involved in early 2023

4   until the time of this ouster in November of 2024, every month

5   the hospital is paying 22,000, approximately, dollars towards

6   the servicing of this $4.5 million debt?

7   A.   Yes, and I would not really call it "servicing."  It was

8   interest only, so we were never knocking down the debt.

9   Q.   So no one ever paid that debt off --

10  A.   No, sir.

11  Q.   -- from Payroll Card Formula or anybody else, to your

12  knowledge?

13  A.   No, sir.  No, sir.  And I talked with the USDA probably

14  on a biweekly basis.

15  Q.   You referenced a $1 million debt.  I think you called it

16  an "economic development debt" with the Highlands Corporation.

17       How is that debt being serviced?

18  A.   Same way.

19  Q.   So there wasn't a million dollar payoff?

20  A.   Actually -- actually, that -- and this was just something

21  that I just found out over the last couple of days -- that,

22  that I'm surprised they have not come knocking on the door

23  because that -- that debt has not been paid in quite some

24  time.  No payments.

25  Q.   But it was never refinanced and paid off by Payroll

1    Card --

2    A.   No, sir.  Nothing was ever refinanced that we -- that

3    we -- as indicated in the terms sheet, nothing was ever

4    refinanced.

5    Q.   Now, you also referenced a $2.5 million debt to First

6    State Bank.

7    A.   Yes.

8    Q.   That debt has been paid off?

9    A.   Yes, sir.

10   Q.   Can you tell the Court when it was paid off?

11   A.   That -- the note on that -- on that loan had been matured

12   and so the bank called, Ken Jones called me directly, and

13   asked me if I wanted to renew the loan.

14        So I ran that by Dennis.  He said, What does it take to

15   do that?  And I said, Well, the first thing they're asking for

16   is financials.  I actually have a text message where he said

17   "I'm not providing financials.  I don't need them in our

18   dirt."  So I don't know what that meant.  I don't -- I, you

19   know, it's just what he responded to me.

20        Then he asked me to go meet with Ken Jones to see if I

21   could persuade him.  Ken Jones and I were relatively close

22   socially.  We would go to dinner or he would have us over to

23   his house.  I went to meet with him, with the then CEO

24   Dr. Timothy York.

25        Kind of an uncomfortable situation.  It got to where I

1    was asking for something that I already knew the answer of

2    before I ever walked in there, and it offended Ken a little

3    bit because he said, "Mike, you know I've got to have the

4    financials.  That's the banking world."  So, obviously, they

5    said no.

6         Next thing I know, Mr. Varghese was contacted by their

7    counsel.  Within 48 hours, the 2 a half million was paid.

8              THE COURT:  I'm sorry.  When was that?

9              THE WITNESS:  I don't know.  It was in '24.

10             THE COURT:  In '24.  Okay.

11   BY MR. BUTLER:

12   Q.   I'm not going to get off on some of the salacious stuff

13   in the response.  But did you have a fight with Ken --

14        (Overlapping speakers.)

15             THE WITNESS:  No.

16   BY MR. BUTLER:

17   Q.   -- Jones or throw anything at him?

18   A.   That's absurd.

19             THE COURT:  Just one at time.  You finish your

20   question.

21        (Overlapping speakers.)

22             THE COURT:  Why don't you reask.

23   BY MR. BUTLER:

24   Q.   Was there any sort of fight with Mr. Jones or anything?

25   A.   No.  And his -- where, when I messaged him, I mean, he

1   kind of laughed.  First I talked to him and he kind of laughed

2   before it.  And he said, Man, welcome to a small town, and we

3   were cutting up about it.

4       But then I asked him, you know, for obvious reasons, Do

5   you care to put that in writing for me because I'm being

6   accused of assaulting, amongst some other things that I don't

7   know where they came from, but he said, Absolutely, I'll send

8   that to you.  And he indicated that no assault ever took

9   place.

10  Q.   And that was the text message that we attached to our

11  reply?

12  A.   Yes.

13  Q.   But so let's go back for the Court because it gets

14  somewhat complicated here.

15      Mr. Jones is the president of First State Bank.

16  A.   That's correct.

17  Q.   Mr. Jones had a loan from his bank for $2.5 million to

18  Pineville Hospital, correct?

19  A.   Yes, sir, that's the loan they gave the hospital when

20  they owned the hospital.

21  Q.   Originally Mr. Jones was also a Board of Director of the

22  Pineville Hospital in late 2022, early 2023?

23  A.   That's correct.

24  Q.   In fact, in Exhibit No. 1, in the defendant's response,

25  which is an iMed agreement, it says iMed at the top.

1        Mr. Jones actually signs that as Board of Director,

2    correct?

3    A.    That is correct.

4    Q.    Now, the document is also signed on behalf of Payroll

5    Card Formula by Christopher Jones?

6    A.    Correct.

7    Q.    Have you ever met Mr. Jones?

8    A.    No, sir, I have not.

9    Q.    So if you need to see this, let me know.  I know it is

10   hard to remember all of these different --

11   A.    It's just three pages.  It's not hard to --

12   Q.    This particular document that was initially negotiated

13   between who was then the Pineville Community Health Center's

14   Board of Directors and Payroll Card Formula, it required the

15   manager to use the best efforts to refinance the current debt

16   within three months.

17       Are you familiar with that now that you've seen the

18   documentation?

19   A.    Very familiar.  Yes, sir.

20   Q.    So Mr. Jones, whenever in 2024 that this loan comes up,

21   certainly knows that the intent of this agreement was that

22   this debt be refinanced.

23       Is that accurate?

24   A.    Absolutely.  He is an attorney out of Memphis that we

25   were told was housing all of the documents that we were asking

1    for.  Yes.

2    Q.   But Mr. Jones -- I think this is very important, I want

3    to specific these question.

4         Mr. Jones was a party to that document, that agreement,

5    that was dated February 7th of 2023, correct?

6    A.   Correct.

7    Q.   Mr. Jones's bank is owed $2.5 million by the hospital,

8    correct?

9    A.   Correct.

10   Q.   And this loan has become due sometime in 2024 to the best

11   of your memory?

12   A.   Correct.

13   Q.   And you have gone to Mr. Jones and you have requested

14   extending the loan, correct?

15   A.   That's correct.

16   Q.   At that point in time, that loan had not been paid off by

17   Payroll Card Formulas, correct?

18   A.   That is correct.

19   Q.   And I assume it's the same thing as the other debts.  The

20   debt had been serviced each month by the hospital's operating

21   account, correct?

22   A.   That's a hundred percent correct.

23   Q.   So the question that the bank had, First State Bank, was:

24   If you want us to extend this loan, we need to see the bank's

25   financials?

1    A.    That is correct.

2    Q.    And Mr. Varghese was not willing to provide those?

3    A.    No.  He withdrew all the money out of that bank and moved

4    it to a separate bank.

5            THE COURT:  What do you mean "all the money?

6            THE WITNESS:  That he did not -- as he said to me, he

7    did not want First State Bank to know the revenue that the

8    hospital was doing, that it had the capabilities to pay off

9    $2.5 million line of credit, so that money was then moved to

10   an undisclosed location.

11           THE COURT:  So the hospital had deposits at that

12   bank?  Is that what you mean?

13           THE WITNESS:  Yes, sir.  Yes, sir.

14   BY MR. BUTLER:

15   Q.    Now we're getting into the summer/fall of 2024.

16         Okay.  Can you tell the Court what a Medicare Cost Report

17   is in the -- and how, the importance of that within the

18   context of particularly a rural hospital like Pineville?

19   A.    Yes.  In your standard metropolitan hospitals, hospitals

20   are paid on fee schedules; so, you know, it's no different if,

21   you know, if you have two orthopedic surgeons that do a knee

22   replacement, they were pretty much paid and reimbursed the

23   same amount.

24         In a rural hospital you have that same hospital set of

25   financials, but then you also have a rural health clinic,

1    which is attached and owned by the hospital.

2        That clinic is a government incentive to where when you

3    allocate costs to the clinic for the hospital, on the

4    hospital's behalf, as long as -- it's -- you almost have to be

5    -- its -- it's not quite that easy to understand.

6        But you look at -- you take your Medicare patient visits

7    and your Medicaid patient visits and you total those up, and

8    then you look at what your expenditures were; and you want to

9    keep those kind of in a balanced scale so that you maintain

10   that higher rate.  It's a government incentive where they pay

11   through your clinic.  If you bill through that clinic, you

12   receive a higher rate.

13       So, for instance, our nursing home visits that we do --

14   and we have 8,000 -- 6- to 8,000 a month out there in the

15   field every single month.  Those are billed through the rural

16   health clinic because it is a higher reimbursement than it

17   would be for a standalone practice to do that and bill it out

18   on its own.

19       The cost report is one of the most key financial pieces

20   and documents that Medicare holds in very very high regard.

21   You have to be accurate.  You cannot -- you know, you can't

22   use hyperbole.  You have to be very factual in those cost

23   reports.

24       So we went to file the cost reports and both years, both

25   cost reports were late because the financials were refused to

1    be turned over to the CPA firm.

2    Q.   Okay.  So let's go to 2024.

3         You've got to do the cost reports.  When are those due?

4    A.   November 30th.

5    Q.   And is it accurate to say that Medicare can cut off

6    funding if you do not prepare the cost report?

7    A.   Absolutely.  Absolutely.  Matter of fact, they did the

8    year before.  Dr. York was the CEO, but to be quite -- just to

9    be frank with you -- through no fault of his own he couldn't

10   submit what he didn't have.  Multiple requests for financials

11   to complete the cost report, never gave it to him.  It was

12   late, very very late.  And they cut off the -- Medicare cut

13   off payments to the hospital; and from what I understand,

14   that's where they stand today, as well.

15   Q.   We'll come back to that.  But I want to go -- you're now

16   the CEO.  You've testified that you became -- even though you

17   were involved in running the hospital -- you actually became

18   the CEO in 2024, correct?

19   A.   Correct.

20   Q.   It is now your responsibility as the CEO to submit the

21   cost reports to Medicare, correct?

22   A.   That's correct.

23   Q.   When did you begin asking for the financial information

24   from Mr. Varghese in order for comply with your legal

25   requirements?

1    A.    Around March or April because the fiscal year ends on

2    June 30th.  So when June 30th hits, you want to start right

3    then on the spot, submitting these things so that Medicare

4    is -- is dealt with in a timely manner.  Because time can get

5    away from you, and the next thing you know, you actually have

6    I think six months to gather all of that information, submit

7    it, have it submitted by November 30th, and you are in

8    compliance with Medicare.

9        A day later -- well, this year, it actually fell on a

10   Saturday so it was that Monday, which would have been, I

11   believe the 2nd.  So you had until the 2nd to submit those

12   financials.

13       The week before I left, those financials were still -- we

14   were still waiting on them after numerous requests.

15   Q.    Now, go back a little bit to -- you testified to the

16   Court that money had been transferred to an account.

17       You were aware of that by Mr. Varghese, correct?

18   A.    Correct.

19   Q.    And what -- where did you believe the money had been

20   transferred and in whose name did you believe it had been

21   transferred to?

22   A.    Well, we were told pointblank that -- we had opened an

23   account.  After the money was pulled out of First State Bank,

24   Mr. Varghese opened up an account at that time b1Bank, okay,

25   and that became the primary bank that we were using.

1       We were told that that money was transferred into another

2    b1Bank account in the Iowa, but red flags started popping up

3    when we realized there was no b1Bank in Iowa.

4    Q.   Now, at what point did you learn -- and how did you

5    learn -- that this money had been transferred out and it

6    wasn't in a hospital account?

7    A.   Well, it was -- Susan Scott, who handles the accounts

8    payable, called me one day and said, Do you know that there

9    has been a total of $7,000,000 missing out of the account?

10   And I said, No, I was unaware of that.

11      And at the time, we had a business office manager by the

12   name of Brittany.  And it just so happens that Brittany

13   happened to quit right, not long after -- after that transfer

14   took place.

15      Well, when we started investigating where is this

16   $7,000,000, we couldn't get a straight answer.  We were told

17   it was in a hospital account, PCHC account.

18      So admittedly, I picked up the phone, called -- and I was

19   told that there was only a hundred dollars in the PCHC account

20   in Iowa.

21      The way I found out about the account in the Iowa is when

22   Brittany left, our IT specialist went through her voicemails

23   because voicemails go to email, okay?

24      So there was a voice -- he started searching her emails

25   to see if she had any track record of that money, and there

1    was a voicemail from the bank in Iowa, and the gentleman said,

2    I just wanted to call and verify because we had a very odd

3    wire transfer come in today, and it seems a little suspect and

4    unusual.  And those were his exact words.

5         So but we did not get that until months later.  We had no

6    idea that that voicemail was there because we had no reason to

7    go through Brittany's emails and stuff, so...

8    Q.   So approximately when did you learn -- and I assume, to

9    clarify your testimony:  When you called, because you were the

10   CEO, you were provided information that there was an account

11   in the hospital's name that had a hundred dollars, because of

12   your position; is that accurate?

13   A.   Correct.

14   Q.   When you inquired about where this $6,000,000 had gone,

15   you were not provided information about that, correct?

16   A.   I was just told that it went to a b1Bank in Iowa.

17   Q.   Okay.  Now, approximately when did you hear the

18   voicemail, learn that this money had been transferred to a

19   b1Bank in Iowa that was not in a hospital account?

20   A.   It was not long before we were all let go.  Early

21   November.  Late October, early November.

22   Q.   What, upon learning that, can you describe to the Court

23   what efforts you made to -- with Mr. Varghese -- to attempt to

24   learn what had happened?

25   A.   Well, honestly, most of the credit there goes to Susan

1    Scott.  She -- she was birddogging every penny that went

2    through that hospital.

3         Numerous requests went out.  You know, we can't -- I

4    can't -- she was the doing the general ledger for the cost

5    report.  So we could not account for $7,000,000 that had to go

6    into this cost report.  She tried numerous times to obtain the

7    whereabouts of the money, why was the money moved; and, quite

8    frankly, just never got an answer other than b1Bank in Iowa.

9              MR. BUTLER:  Could I have one second?

10             THE COURT:  Of course.

11        (Off-the-record discussion.)

12             MR. BUTLER:  Your Honor, may I approach?

13             THE COURT:  You may.

14   BY MR. BUTLER:

15   Q.   I'll show you what I have marked as Exhibit 1, which

16   is -- if you, if you could tell the Court what that is,

17   please?

18   A.   That was the initial correspondence between you and

19   Ms. Richter and Mr. Varghese.

20   Q.   And that was dated on -- if you could tell the Court,

21   please.

22   A.   November 22, 2024.

23   Q.   In that correspondence, the first thing that you request

24   on page 2 was to provide all financial information?

25   A.   That is correct.

1    Q.   And to return the money that had been transferred to

2    b1Bank to the operating account, correct?

3    A.   That is correct because as the CEO I was required to sign

4    the cost report, and that is a felony if I sign a fraudulent

5    document.  I was not about to -- to sign something when I was

6    made aware of a $7,000,000 discrepancy in the account.

7    Q.   And pursuant to that letter, we requested compliance by

8    November the 26th of 2024, somewhere around Thanksgiving time,

9    correct?

10   A.   That is correct.  Yes, sir.

11   Q.   Okay.  And so in response to this letter, did you -- did

12   you get this credit agreement?

13   A.   No, sir.

14   Q.   Did you get any of this bank information?

15   A.   No, sir.

16   Q.   Did you ever get any documentation saying they refinanced

17   this loan and paid off all of these debts?

18   A.   Nothing.

19   Q.   Did you ever get any information that says that Payroll

20   Credit Formula infused $6,000,000 into a nonprofit hospital?

21   A.   No, sir.

22   Q.   Because that didn't happen, did it?

23   A.   No.

24   Q.   Now, at that point in time, we received correspondence

25   from a different set of counsel saying -- or we received

1    correspondence from Ms. Richter that she was going to attempt

2    to obtain counsel.

3        Do you recall that?

4    A.   I do recall that.

5    Q.   And then, the next thing that you heard, you had been

6    fired as CEO, correct?

7    A.   Correct.

8    Q.   Your wife had been removed as a Board of Director,

9    correct?

10   A.   That's correct.

11   Q.   Did you ever receive notice of any sort of Board of

12   Directors meeting?

13   A.   No, sir.

14   Q.   To your knowledge, did your wife ever receive any sort of

15   notice of any Board of Directors meeting?

16   A.   No, sir.

17   Q.   Were you ever given any sort of sit-down meeting to

18   discuss any of this?

19   A.   No, sir.

20   Q.   Can you tell the Court how you learned that you had ben

21   ousted?

22   A.   Dennis called me.  He blocked the number.  Before I even

23   had a chance to be say hello, it hung up on me, and there was

24   a voicemail from him telling me that I had been terminated and

25   that Natalie had been removed from the board.

1    Q.   Now, prior to appearing in United States District Court,

2    you had directed us to file an action in Pineville Circuit

3    Court, correct?

4    A.   That's correct.

5    Q.   During that process, did you ever receive any of these

6    financial documents that they had tendered?

7    A.   No, sir.

8    Q.   Were you aware that there was a -- that Ms. Richter,

9    behalf of the hospital, had given this credit agreement to

10   Mr. Varghese?

11   A.   No, sir.

12   Q.   What was your understanding of their relationship prior

13   to this initiation of this lawsuit?

14   A.   When I was first introduced to Ms. Richter, it was in

15   Nashville with another group of people.  We were all out

16   together one night, and she was introduced as his assistant

17   of -- I can't remember if it was 10 or 15 years, but it was --

18   she was introduced to us as his assistant.  His personal

19   assistant.

20   Q.   Okay.  Now, during this time that this matter was pending

21   in circuit court, did you ever receive any of those financial

22   documentation?

23   A.   No, sir.

24   Q.   Did you ever receive any of it prior to this Court

25   ordering them to provide some sort of the financial

1    information?

2    A.   No, sir.

3    Q.   Now, there have been -- I'm going to touch on some of

4    these quickly.

5    A.   Sure.

6    Q.   There is an allegation that you and your wife have stolen

7    money.

8         What -- first of all:  Did you steal any money from

9    Pineville Hospital?

10   A.   No.  As a matter of fact, my wife and I have loaned the

11   hospital $115,238.

12   Q.   There was as discussion -- I'm not going to get into it

13   -- we'll be here for a month if I try to go through every one

14   of these things -- but I'm going to try to hit the highlights.

15        There is a reference that there was a $30,000 check paid

16   from the hospital account to your wife.

17        Can you tell the Court what that was for, if you have

18   documentation.

19   A.   Absolutely.  We were in the process of remodeling the

20   hospital, the contractor had not been paid and, quite frankly,

21   the contractor lives in the same vicinity of Tennessee that I

22   do.  I did not want -- want, you know, I didn't want word to

23   spread we don't pay our bills.  We paid him, and then we

24   submitted the invoices to Susan who then reimbursed for us

25   paying for that out of our own personal account.

1    Q.   There was a discussion in the reimburse --

2         THE COURT:  Mr. Butler, I want to be sure we're kind

3    of metering the proof across the morning.  Both sides need to

4    have a chance to put on what they want, and then have some

5    argument time, so bear that in mind if you would.

6         MR. BUTLER:  Thank you.

7         THE COURT:  Thank you.

8         MR. BUTLER:  May I approach, Your Honor?

9         THE COURT:  You may.

10        MR. BUTLER:  I'm going to go try to speed this up a

11   little bit.

12   BY MR. BUTLER:

13   Q.   I'm showing you what I've marked as Exhibit No. 2.

14        Can you tell the Court what that is?

15   A.   It is a -- it's a copy of our own personal bank account

16   that we hold at U.S. Bank, Natalie and myself.

17   Q.   Does it show a withdraw of $26,000?

18   A.   $25,000.

19   Q.   $25,000.

20        That is what you're referencing as what you repaid

21   yourself that went to the contractor?

22   A.   That is correct.

23   Q.   Okay.

24   A.   Yes, sir.

25   Q.   There's handwriting on there.  "Juan."

1      I assume Juan is the contractor?

2  A.   Juan.  Yes.

3  Q.   Now, there is an allegation that you opened some sort of

4  secret account.

5      Can you tell Court if that is accurate and briefly

6  explain that?

7  A.   No, sir, that is not -- that is not accurate.  I was

8  actually quite disheartened when that accusation was made.

9  That account was opened with Board -- with Board resolution

10  that they had to carry down there by my wife, Natalie, and the

11  CEO at the time Dr. York opened that account.

12      The reason they opened that account because, was because

13  we had stacks and stacks of checks from where patients would

14  pay copays or making payments on their hospital accounts,

15  things of that nature.

16      We had nowhere to put them and so Dr. York repeatedly --

17  almost to the point of pestering Dennis about, What do we do

18  with this?  And he was instructed to open a bank account at a

19  local bank for that purpose.

20      That account was used for maintenance, supplies,

21  purchasing, and the department used it.  It had two debit

22  cards; one stayed with the director of maintenance, one stayed

23  with the director of purchasing.

24  Q.   There is two more topics and then I'm going to go move

25  on.

1          There is an allegation that you were paying out of

2     hospital proceeds to fund an MMA fighter or boxer.  I can't

3     remember exactly which.

4          Can you explain to the Court, to the Court, what the

5     delays, association with the hospital was?  What Struggle

6     Jennings, Waylon Jennings grandson, and some others, what

7     their association for the hospital was, how that was going to

8     benefit the hospital, please?

9     A.    Absolutely.  Those are two separate issues.

10    Entertainment industry, we'll call it was a concept that I

11    came up with called Sound Sobriety.  And artists like Struggle

12    Jennings, Jelly Roll, Bradley Gilbert is a big part of it now.

13         There was -- we don't have to go through all of the

14    names.  What it was, was a different approach to 28-day

15    rehabilitation.  Okay.  So it was a substance abuse program;

16    but what we wanted to do, in addition to that, was expand that

17    to cover psych services as well.

18         So we went through the conversion process in converting

19    those beds into to psych beds.

20         So the payments to Mr. Delay and his son were different

21    than to Mr. Jennings.  I was not privy to -- Mr. Jennings was

22    supposed to be here, I don't know if he's here or not; but

23    there was a meeting that I was not privy to during the.

24    Mt. Laurel Festival between Sheryl Dennis and Struggle.

25    Apparently there was payment arrangements and guarantees made

1    that he was to be paid X amount of dollars month, and to my

2    knowledge, they never paid him.

3         You know, so, in regard to the MMA stuff, that is just a

4    complete fabrication of the truth in correlation with Joseph

5    Nagle and Pineville.  The youth program -- Fred Delay and

6    Austin Delay run a youth program in Nashville.  So they worked

7    with the judicial system in Pineville to open a similar youth

8    program that I spoke about earlier in the city of Pineville.

9         So they had met with every church, they had met with the

10   entire school system, the school board.  They had met with

11   everybody that mattered in Pineville about this youth program,

12   and the concept was put together that we were going to offer

13   all of these services and give the youth something to do.

14        It was -- so we signed a dollar a year lease with a

15   church that had a huge metal building that was going to be

16   converted into a basketball court.  There was a boxing ring;

17   and then it had a loft upstairs and those were going to be

18   converted into classrooms where we could do the education,

19   educational component.

20        It was also faith-based program so churches were a big

21   part of that.  So we still get calls today wanting to know

22   when that's going to open because it was something that --

23   that the community was is really looking forward to.

24        Austin Delay was paid a flat rate of $5,000 a month to

25   run that entire youth program.  Fred Delay was paid $7,500 per

1    quarter, which Dennis and I spoke about because he couldn't

2    believe that Fred said he would do it for $35,000 a year

3    because of travel.  And anything outside of that is just a

4    complete fabrication of the truth.

5    Q.   Final question -- most important question:  Can you

6    explain to the Court your understanding of the current status

7    of Pineville Hospital and why it is important that this Court

8    put you and your wife back into your positions that were, from

9    our perspective, wrongly terminated?

10   A.   The literature speaks for itself.  The vibe of the

11   hospital speaks for itself.  I'm not going to use any names

12   today.  I know that employees have been threatened to be fired

13   if they reached out to us.  We probably receive seven to eight

14   phone calls a day saying the place is falling apart, Medicare

15   payments have been cut off.  The group that does the 6- to

16   8,000 visits a month, they're in fear of not getting paid,

17   moving forward.

18        So unless, you know, unless we come back into the

19   hospital, that's $30,000,000 that that the hospital is going

20   to lose in revenue overnight.

21        As they would -- they instruct, or said that they would

22   follow us and go to whatever hospital that we did.

23        But I want to be on the record.  We don't want to go

24   anywhere else.  We -- like I said -- we moved our entire

25   family to Pineville.  We care about that community.  We have

1    close ties and the staff has been throughout -- through

2    absolutely hell.  I mean, they went -- I mean, prior to us

3    coming onboard, they went weeks without getting paid.  I heard

4    stories of people sleeping in the hospital because they

5    couldn't pay their rent.  I've heard it all.

6        We get calls every single day, Your Honor.  I could hand

7    you my phone and let you read it yourself, begging us to come

8    back.  And that's not to pat ourselves on the back.  That's

9    because the staff bought into what we put out in front of

10   them.  They executed it.  We just came up with the idea.  But

11   all they needed was some guidance and leadership.  It is just

12   as simple as that.  Right now they have no income.

13   Q.   And the folks in the gallery are here in support of you,

14   correct?

15   A.   That's correct.

16        MR. BUTLER:  Your Honor, that's all the questions

17   for.  Thank you for your time.

18        THE COURT:  Thank you.

19   Mr. Kelly.

20        MR. KELLY:  Can I have just one second, Your Honor?

21        THE COURT:  Yes, of course.

22   (Off-the-record discussion.)

23        MR. KELLY:  Thank you, Your Honor.  Appreciate the

24   indulgence.

25        THE COURT:  Absolutely.  You can examine from the

1    podium or wherever you are comfortable.

2          MR. KELLY:  Thank you.  I'll be relatively quick.

3       As the Court knows, we have not engaged in any discovery

4    in this case, so I'll tread somewhat lightly.

5                           CROSS-EXAMINATION

6    BY MR. KELLY:

7    Q.   Mr. Frey, I'm Donald Kelly.

8    A.   Nice to net you.

9    Q.   I represent the directors.

10   A.   I understand.

11   Q.   So if I understand this correctly, you were not part of

12   any of the negotiations on the financial end of this deal,

13   right?

14   A.   No, that's incorrect.  I was the meet -- I mediated to

15   keep parties at the table.

16   Q.   Oh, you mediated to keep the parties at the table.

17        But you never saw the credit agreement?

18   A.   No.

19   Q.   You never saw the financial arrangements at all between

20   the hospital and Payroll Card Formula?

21   A.   No, sir.  I did not.

22   Q.   And you were not part of the term sheet agreement,

23   correct?

24   A.   The initial term sheet?

25   Q.   Yeah.

1   A.   The one with iMed made at the top?

2   Q.   Yeah.

3   A.   No, sir.

4   Q.   So you didn't have anything to do with the negotiations

5   between the Board at the time --

6   A.   No.  My job was --

7        THE COURT:  Hang on.  Let him finish his question.

8   I'll let you finish your answer.  Let him finish the question.

9   BY MR. KELLY:

10  Q.   You didn't have anything to do with the negotiations

11  between Pineville Community Health Center, Inc., the

12  nonprofit, correct?  Run by the bank's designees, correct?

13  Mr. Power and Ms. Reece.

14       You didn't have anything to do with negotiation of this

15  document, the term sheet, as the hospital was about to go

16  under again?

17  A.   Can you define "have anything to do with"?

18  Q.   Did you negotiate the document?

19       Were you involved in this document?

20  A.   I did not sign the document, no; but I had conversations

21  with both parties and mediated between the two.

22  Q.   Oh, mediated.  And so the board at the time knew all

23  about this document.

24       They signed it, correct?

25  A.   The first three pages, yes.

1      It was after a debt assumption.  My role was -- was to

2   get them to agree to accept that we would take the hospital

3   over and assume debt.  That was my intent.

4   Q.   That was your understanding of what was going to happen,

5   but you never saw -- nobody ever told you -- nobody asked you

6   to be involved in any of the deal making?

7   A.   Well, that was the deal.

8   Q.   Well, the deal is represented by terms of the contracts

9   that were signed.

10      You weren't aware of the board's consent actions in

11   February of 2023 either, correct?

12   A.   No.  Nobody was.

13   Q.   Well, you weren't.

14   A.   Right.

15   Q.   So you don't -- you didn't -- you weren't involved with

16   the board appointing a sole member, correct?

17      You didn't know anything about it, did you?

18   A.   No.

19   Q.   That was the board's decision, not your decision, because

20   you weren't on the board and you weren't even employed by

21   hospital at the time, correct?

22   A.   That's correct.

23   Q.   Okay.  And you weren't involved with the board amending

24   the bylaws?

25   A.   Nobody was aware of that until about two weeks ago.

1    Q.   Well, you received -- you had those bylaws, didn't you?

2         You had gotten a copy of bylaws?

3    A.   Which bylaws are you referring to?

4    Q.   The only bylaws for the hospital.  Bylaws of --

5    A.   From Kevin Couch?

6    Q.   The ones that Kevin Couch sent you in January.

7    A.   Yeah.

8    Q.   Have you seen those?

9    A.   Yes.

10   Q.   But you weren't involved in the board's determination in

11   2023, in January of 2023 or February of 2023, to negotiate to

12   change the bylaws, correct?

13        You didn't know that happened.  Is that your testimony?

14   A.   Not only was I not, but the board wasn't, either.

15   Q.   The board didn't know that the board had changed the

16   bylaws?

17   A.   Because my wife was never notified, and she was on the

18   board.

19   Q.   Did you ever ask your wife how she thought she got

20   appointed to the board in the first place?

21   A.   Because we were part of Kentucky Medical Management --

22   Q.   Okay.

23   A.   -- which was supposed to house the board and manage the

24   hospital.

25   Q.   And so you never saw any of those agreements, any of the

1    consent agenda --

2    A.   Fifty-one times we asked for them.

3          THE COURT:   Is your answer, no, you didn't see it?

4          THE WITNESS:  Yes.  No.

5    BY MR. KELLY:

6    Q.   And you testified that you understood that you were to

7    own 33 percent of the hospital, and your wife was going to own

8    33 percent of the hospital, and the financiers was going to be

9    33 percent?

10   A.   No.  I didn't say that.

11         THE COURT:   Go ahead.  Restate your understanding.

12         THE WITNESS:   Dennis was going to own 33 percent,

13   Natalie was going to own 33 percent, and it was represented to

14   us that "the money" owned the other 33 percent.

15   BY MR. KELLY:

16   Q.   So your understanding was your wife, Natalie -- that's

17   your wife, correct?

18   A.   Correct.

19   Q.   She was going to own 33 percent of the hospital?

20   A.   No.  The hospital is a nonprofit.

21   Q.   What was she going to own 33 percent of?

22   A.   The managing company that houses the board.

23   Q.   Did you ever see a document that said she owned

24   33 percent of the management company?

25   A.   Fifty-one requests that we asked for that document.

1       THE COURT:  Can you just answer and I'll let you

2   explain?

3       THE WITNESS:  Okay.  No, sir.  No, sir.

4   BY MR. KELLY:

5   Q.  You've never seen a document that said that your wife or

6   you owned the management company, any portion of it, correct?

7   A.  Actually, there was one document that listed Sheryl,

8   Dennis, and Natalie and the document said

9   "ownership/management."

10      So yes.  To answer your question, yes, signed off by

11  Ms. Richter.

12  Q.  And you got paid $780,000 a year for your work, didn't

13  you?

14  A.  My wife and I collectively did.  Yes, sir.

15  Q.  Your wife isn't employed at the hospital, is she?

16  A.  She was part of the management.

17  Q.  She get paid as a board member.

18  A.  No.

19  Q.  $780,000 a year is what you were paid.

20  A.  That's correct.

21  Q.  $15,000 a week?

22  A.  That's correct.

23  Q.  And you borrowed money from Payroll Card Formula, didn't

24  you?

25  A.  That is incorrect.

1   Q.   And when you were terminated, you lost your $780,000 a

2   year job?

3   A.   Well, that's what happens when you're terminated.

4   Q.   Yeah.

5   A.   Can I explain?  Am I allowed to answer that question?

6           THE COURT:  Briefly.

7           THE WITNESS:  Okay.  I think that it's important that

8   you know that the average management fee in the United States

9   to manage a hospital is between 5 and 20 percent.  Our

10  percentage rate was 1.98 percent.

11      So to insinuate that it was all about money is just

12  entirely untrue.

13  BY MR. KELLY:

14  Q.   You were responsible for filing the Medicaid Cost Report

15  last year; is that right?

16  A.   I took over.  No.  Blue Co filed it without signatures

17  under the -- when he, when Dr. York was the CEO of the

18  hospital.  After I took over as CEO, then the cost report was

19  filed.

20  Q.   What year are we talking about?

21  A.   '23.

22  Q.   The cost report for July 1 of 2022 through June 30th of

23  2023?

24  A.   That's correct.

25  Q.   And that was filed in May of last year?

1    A.   That's correct.

2    Q.   Six and a half months late?

3    A.   Uh-huh.

4    Q.   It was filed under your name, correct?

5    A.   That is correct.

6    Q.   And you were the CEO at the time.

7         You say you were the CEO -- interim CEO at time, or were

8    you president?

9    A.   No, I took about half -- halfway through that process, it

10   was under the direction of Dr. York and the financials were

11   never given to him.

12        I took it over as CEO, requested the financials, met with

13   the CPA firm; they also asked for the financials.  Finally the

14   financials were submitted, the cost report was then submitted.

15   Q.   And you submitted this cost report six and a half months

16   late?

17   A.   Yeah.  I submitted it when we got the financials.

18   Q.   And that was accepted.

19        Do you know when that was accepted?

20   A.   Our payments were turned back on in June, so it would

21   have been middle of May.

22   Q.   So they refunded all of the payments.

23        When you filed this six and a half months late, last

24   year, then the payments came back on and the hospital received

25   all of its funding; is that correct?

1    A.   You are correct.

2    Q.   Okay.  And just so I'm clear on this:  The money

3    transfers in November of 2023 --

4    A.   Okay.

5    Q.   -- that you have complained about in December of 2024,

6    you knew about at the time.

7    A.   Absolutely.  I called Dennis the next day.

8    Q.   Okay.  So you knew that there had been money transferred

9    about a week after the First State Bank sent the letter

10   claiming -- not claiming -- telling the bank that it was in

11   default on its loans, correct?

12   A.   That's correct.  That's what I stated earlier.

13   Q.   Yeah.  And that letter went to Mr. Varghese, not to you,

14   correct?

15   A.   It came to the hospital.

16   Q.   It came to attention of Mr. Varghese.

17        Did you see that letter?  Did you see the letter from

18   State Bank saying you're now in default?

19   A.   To be honest with you, I don't want to -- I don't recall.

20   I have no reason not to tell you that answer.

21   Q.   Okay.  So that's October the -- that's October 23rd,

22   2023.

23        The bank has now told the hospital it's in default on its

24   credit?

25   A.   Okay.

1    Q.   Okay.

2    A.   I believe so you.

3    Q.   Okay.  Well, and it froze its accounts?

4    A.   Yes.

5    Q.   And while you don't know what the credit document -- the

6    credit facility says, the transfer of the money that you are

7    now complaining about -- having known about at the time --

8    occurs about a week after that, doesn't it?

9    A.   Into what we were told was a b1 bank account in Iowa.

10   Yes, sir.  In the hospital name, which was untrue.

11           MR. KELLY:  That's all the questions I have at this

12   point.

13           THE COURT:  Thank you.

14       Do you have any idea what the net worth would have been

15   for the hospital around the time late '22, early '23?

16       What it would look like on a balance sheet.

17           THE WITNESS:  I know that before we took over, the

18   hospital did $6,000,000, and after we had been in there for

19   about 16 months it had done 39 million.

20           THE COURT:  No.  I mean, what's the net position of

21   the hospital in late '22, early '23.  What the financing is.

22           THE WITNESS:  To be totally honest with you, sir.  I

23   never saw the financials.  I couldn't get them.

24           THE COURT:  And when First State Bank was the primary

25   lender, it, essentially, had control of the board; is that

1     right?

2              THE WITNESS:  When?  Prior to the acquisition?

3              THE COURT:  Well, prior to the '23 --

4              THE WITNESS:  Yes, sir.

5              THE COURT:  -- transaction.

6              THE WITNESS:  Yes, sir.  Yes, sir.  That's correct.

7              THE COURT:  And you're telling me there's a

8     resolution from the board authorizing the opening of that

9     account at community bank?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And that would have been during the

12    period when Mr. Varghese and Ms. Richter were on the board?

13             THE WITNESS:  Yes, sir.  Yes, sir.

14             THE COURT:  Okay.  Mr. Butler, briefly.

15             MR. BUTLER:  No, Your Honor.  I have no follow-up.

16             THE COURT:  Okay.  Thank you, sir.  You can step

17    down.

18             THE WITNESS:  Where should I throw these, or do you

19    want them?

20             THE COURT:  Just leave them up there and we'll gather

21    them or take them.  You've probably got a trash can back

22    there.  Thank you.

23        Mr. McTighe or Mr. Butler.

24             MR. BUTLER:  Can I have just one second, Your Honor?

25             THE COURT:  Uh-huh.

1          (Off-the-record discussion.)

2              MR. BUTLER:  Your Honor, we could call Susan Scott

3      briefly.

4              THE COURT:  All right.  Susan Scott.

5                SUSAN SCOTT, PLAINTIFF'S WITNESS, SWORN

6              THE WITNESS:  I do.

7              THE COURT:  Good morning to you, ma'am.

8              THE WITNESS:  Good morning.

9              THE COURT:  Would you state your name and spell your

10     last name?

11             THE WITNESS:  My name is Susan Scott.  S-c-o-t-t.

12             THE COURT:  Thank you.  Do try to speak directly

13     toward the tip of that mic in a clear voice so we can hear

14     you.  There you go.

15         Mr. Butler.

16                         DIRECT EXAMINATION

17     BY MR. BUTLER:

18     Q.   Ms. Scott, I'm going to go quickly because we have some

19     time constraints, okay?

20         Can you tell the Court what your position at Pineville

21     Hospital was until recently?

22     A.   I currently was the chief human resource officer.  I

23     worked accounts payable, done the general ledger, done the

24     payroll.  I had been employed there this month -- this week,

25     actually -- would have been 26 years.

1   Q.   And you've had no relationship with Natalie or Michael

2   Frey, do you?

3   A.   No.

4   Q.   Can you tell the Court what your role was in trying to

5   comply with the Medicare Cost Report.

6   A.   Yeah.  I took care of logging entries into the CPSI.  Any

7   of the banking activity, vendor activity with the cost report.

8   I uploaded general ledgers.  Kind of showed where the money

9   was going out of the accounts, out of the banking accounts.

10  Q.   And, Ms. Scott, can you tell the Court about your efforts

11  to get full compliance with financial documentation from

12  Mr. Varghese as it relates to filing an accurate cost report?

13  A.   Yeah.  I had sent an Excel spreadsheet to Sheryl, so I

14  was waiting to get some answers back.  I had been working on

15  the cost report, logging what entries I knew were available at

16  the time.  So I was still holding for some information to log

17  the rest of the entries.  I had a spreadsheet with some other

18  stuff that that Scott Murdy had sent previous.  That was on my

19  desktop.

20          THE COURT:  Was that the CPA?  Scott Murdy?

21          THE WITNESS:  Yes.  Yes.  Scott Murdy.

22          THE COURT:  Okay.

23  BY MR. BUTLER:

24  Q.   I think you can continue.  Did you -- what information

25  were you given about the transfer of $7,000,000 from the

1    Pineville Hospital to an account in Iowa?

2        Were you ever given any information about that?

3    A.   Well, when the spreadsheet was sent back there was some

4    questions.  The entries for a million said "Kentucky Medical

5    Management" I believe, and at that time I didn't know what

6    that was.

7        The second injury, entry, the 6,000,000 -- and I'm not

8    sure, I want to think because I don't have -- since I've been

9    fired, I don't have any of that in front of me -- but I want

10   to think that they sent it back as the Payroll Card Formula.

11   Q.   In your position, did you have any idea what the Payroll

12   Card --

13   A.   I did not --

14   Q.   -- Formula?

15   A.   -- I had never heard.

16       THE COURT:  Just let him finish his question and I'll

17   let you give your answer, okay?

18   BY MR. BUTLER:

19   Q.   You did have any idea in your position what Payroll Card

20   Formula was?

21   A.   No.

22   Q.   Were you provided any information at that point in time?

23   A.   Not at that time that I can recall.

24   Q.   But you requested it?

25   A.   Uh-huh.  Yes.

1    Q.    Who did you request it from?

2    A.    I spoke to Sheryl.

3    Q.    When you say "Sheryl," you're talking about Sheryl

4    Richter?

5    A.    Sheryl Richter, yes.

6    Q.    Now, there has been a discussion about a commercial bank

7    account.

8          Were you familiar with a commercial bank account?

9    A.    Yes.

10   Q.    What was that account opened for?

11   A.    At the time that it was opened, we had checks in the

12   business office that needed to be deposited.  And they were

13   not wanting to put any checks into the First State Bank

14   account at that time.  They were wanting to stop using that

15   account.

16         And we had -- since b1 -- I'm assuming since b1 was not

17   in our local area, and there is not one locally -- there was a

18   discussion that Dr. York, the previous CEO, had discussed with

19   I think Dennis and maybe Michael about opening a local

20   account.

21   Q.    Can you describe for the Court what happened with your

22   termination?  You told the Court you were fired.

23         Can you tell the Court when you were, by whom, and what

24   happened in relation to that firing?

25   A.    Yes.  The last -- the day before Thanksgiving,

1    Ms. Richter and Mr. Varghese entered the facility, I want to

2    think it was after launch, so it was around 1:00.  I was

3    just -- the medical staff secretary, Theresa McCarty called me

4    to her -- or told me that Sheryl -- called me on my cellphone

5    and told me that Sheryl needed to see me.

6         So when I went back to the administration, I was met with

7    a gentleman, at the time I didn't realize that was security,

8    Ms. Richter and Mr. Varghese and I was told that I was being

9    terminated.

10   Q.   Were you given a reason?

11   A.   No reason.

12   Q.   But you were the one that had been asking for the

13   financial --

14   A.   Yes.

15   Q.   -- documentation --

16   A.   Yes.

17   Q.   -- correct?

18        And can you tell the Court, from your estimation, how the

19   hospital was running and what the morale in the hospital was

20   and what its reputation was in the community during the time

21   that Michael Frey was the CEO?

22   A.   Its morale was really, was really good.  We -- everybody

23   was really hopeful in the community.  There was a lot of good

24   things that were coming.  The drug rehab, the nursing home

25   was -- was a really big plus.  It was -- there

1   was everybody -- it was like a family atmosphere.  Everyone

2   got along well.  Of course, you're going to have a few people

3   that don't always get onboard with anything new, any changes.

4   But it seemed to be like a family, like it was years ago.

5   Q.   You told the Court you had been there 26 years until your

6   termination.

7   A.   Uh-huh.  Of this -- this week would have been my

8   26 years.

9   Q.   And I'm not asking for names, but can you tell the Court

10  what your understanding of how, what the morale is and how the

11  hospital is the operating today?

12  A.   I've actually -- you know, I have friends that I have

13  known there for 20-plus years, like real close personal

14  relationships.

15       Since I was fired, there has been no communication.

16  They're not allowed to speak to me, and I -- I've only spoke

17  to a few people, like, some patients that were in the hospital

18  and a few of the other employees.

19       And from my take, it is almost like a doom and a gloom,

20  and it's like they're walking on nails; nails or on eggshells.

21       I have spoke to -- a couple of vendors have called me

22  because they ask, "Is it true that you are not working there?"

23  And I said, "That's true.  I was fired."

24       And they're saying that the employees are -- are just

25  scared to even tell them anything of what was going on, so

1    there is a lot of fear in the building.

2            MR. BUTLER:  Your Honor, that's all the question I

3    have.  Thank you.

4            THE COURT:  Mr. Kelly.

5            MR. KELLY:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. KELLY:

8    Q.   Mr. Scott, I'm Don Kelly.

9    A.   Hi.

10   Q.   How are you?

11   A.   I'm good.

12   Q.   Good.  So you were the only person who was responsible

13   for entering expenses into the general ledger, correct?

14   A.   There is another young lady that helps me.

15   Q.   Oh, under you.  It was your responsibility to enter all

16   of the expenses?

17   A.   There.  Yeah.

18   Q.   Yeah.  Okay.  So somebody else helped you with some of

19   it?

20   A.   Yes.

21   Q.   Okay.  I gotcha.  Okay.  And so you entered -- you were

22   responsible for entering everything into the general ledger at

23   the hospital?

24   A.   At the time, yes.

25   Q.   Yeah.  Until you left?

1    A.   Uh-huh.

2    Q.   Okay.  And how much money flowed into the commercial bank

3    account?

4    A.   I can't answer that clearly because I didn't look at it

5    on a -- as a whole.  I only looked at it in increments, in

6    monthly increments.  So I can't give you a --

7    Q.   I don't need an exact number.  It was millions, correct?

8    A.   In commercial bank?

9    Q.   Yeah.

10   A.   No.  I don't think so.

11   Q.   Okay.  You think it was hundreds and hundreds of

12   thousands of dollars over the course?

13   A.   Probably.  But no millions, no.

14   Q.   What is the CPSI?

15   A.   That is our hospital-based system.

16   Q.   And what does that mean to you?

17   A.   That is -- that's where your EMR is.  The finance, the

18   payroll, the business office.  Everything runs through that

19   system.

20   Q.   Okay.  That's where you would pull out of that system the

21   monies flowing to the hospital, in part.

22   A.   I'm sorry.  I don't understand what you're saying.

23   Q.   So you it tracks the payroll and the monies?

24   A.   Uh-huh.

25   Q.   And the commercial bank account was not in that system,

1   was it?

2   A.   Yes, it was.

3   Q.   It was?

4   A.   Yes.

5   Q.   Okay.  Do you know who put it in there?

6   A.   Well, me as the AP clerk and doing the general ledgers,

7   yes.  I am the one that enters any of the bank.  I entered b1,

8   commercial bank.  All of those.

9   Q.   Do you know who the authorized users were for commercial

10  bank?

11  A.   When the bank account was established, it was Dr. Timothy

12  York, who was the CEO, and I believe Natalie Frey.

13  Q.   And after Mr. York -- excuse me -- Dr. York left, the

14  only two authorized users of commercial bank Mr. Frey and

15  Mrs. Frey?

16  A.   Yes.  When Dr. York left, uh-huh.

17       MR. KELLY:  That's all the question I have, Your

18  Honor.

19       THE COURT:  Thank you.

20       During the period that you were running the general

21  ledger and paying the bills that came in, was the hospital

22  able to pay its bills?

23       THE WITNESS:  We could have, yes.

24       THE COURT:  Well, I'm asking:  During that period

25  until you were fired, was the hospital paying its bills?

1          THE WITNESS:  We were paying only what we had to pay;

2     the essential bills, yes.

3          THE COURT:  But that was successfully happening?

4          THE WITNESS:  Commercial bank was one of those

5     accounts.  That's the only place that we could get our general

6     patient supplies, was through that debit card, through that

7     bank.

8          THE COURT:  That's a very specific answer.

9       I'm just generally asking:  Was the hospital able to pay

10     its bills as a going concern while you were -- until the end

11     of your tenure there?

12          THE WITNESS:  Yes.  We were paying -- not everyone

13     that we should have been paying; but, yes, we were.

14          THE COURT:  Okay.  Thank you.

15       Mr. Butler.

16          MR. BUTLER:  No, sir.

17          THE COURT:  Anything else on that?

18          MR. KELLY:  No, Your Honor.

19          THE COURT:  Okay.  Thank you, ma'am.  You can step

20     down.  You're free to stay in the courtroom or leave.  It's up

21     to you.

22       Mr. Butler.

23          MR. BUTLER:  Your Honor, I don't believe we have any

24     witnesses, just argument.  I guess for proof purposes, Your

25     Honor, we certainly may address the documents, both in

1   Mr. Kelly's response and ours.  I don't know if you formally

2   admitted those.  If you do, I would move to admit the

3   exhibits, both parties responses; if not, may we have

4   reference those, sir?

5        THE COURT:  I think it makes sense just to consider

6   everything that's been filed part of the decisional record.

7        Any objection to that?

8        MR. KELLY:  No, Your Honor.

9        THE COURT:  You did you mark a couple of things

10  today.  I think maybe one of them was in the record, but maybe

11  the checking --

12       MR. BUTLER:  It was not, Your Honor.  It's --

13  (Overlapping speakers.)

14       THE COURT:  That's 2, Exhibit 2.

15       MR. BUTLER:  Yes, sir.  One was already in there.  It

16  was --

17  (Overlapping speakers.)

18       THE COURT:  So I'll consider those -- or that one

19  part of the hearing record, as well.

20       Did you tender that to the clerk?

21       MR. BUTLER:  It may still be on the witness stand.  I

22  don't know.  I think Mr. Frey was the witness.

23       THE COURT:  Either you have it or he walked off with

24  it.

25       MR. BUTLER:  He walked off with it.

1          May I approach?

2          THE COURT:  You may.  Just let Mr. Kelly eyeball it,

3   that he's comfortable that's the same thing he saw.

4          Okay.  Very good.

5          MR. BUTLER:  Thank you, Your Honor.

6          THE COURT:  Thank you.  So we've doing going an hour

7   and half.  I don't mind taking a ten-minute break, if that

8   would be helpful to everybody.

9          Does that sound like a good idea?

10         MR. KELLY:  I don't mind a ten-minute break.  I would

11  like to know -- I haven't had a chance to really speak much.

12         THE COURT:  I'm going to turn to you now, if you have

13  proof.

14         MR. KELLY:  If that's where we are, that would be

15  fine.

16         THE COURT:  Why don't we take ten minutes and we'll

17  come back at 10:45 by my watch and pick up with the proof of

18  the defense.

19         (Recess from 10:35 a.m. until 10:45 a.m.)

20         THE COURT:  Thank you.  We have reconvened after a

21  short break.  Looks like all of the hearing participants are

22  present.

23         Mr. Kelly, I'll now turn to you for any proof on behalf

24  of the defendants.

25         MR. KELLY:  Your Honor, I was going -- I'm not sure

1    that I'm going to put on additional proof.  I have some

2    arguments.  I want to go through the proof we put in, if

3    that's all right.

4        The only issue that I had just coming in -- I just asked

5    them -- I realized I didn't have a declaration on, that I'm

6    going to want to talk about.

7        The hospital payroll is about a million dollars a month,

8    by the time you add all the people and all the payments that

9    they have to make to the providers and that -- if they will

10    stipulate to that, otherwise, I would put somebody on that

11    would say that.

12        MR. BUTLER:  May I have one moment, Your Honor?

13        THE COURT:  Yes.

14        MR. KELLY:  I apologize for springing that on him.  I

15    just realized I didn't have the declaration.  I don't know

16    it's particularly controversial.

17    (Off-the-record discussion.)

18        MR. KELLY:  I think everybody agrees there's no

19    problem with me stating that.

20        THE COURT:  So you're not going to put on any --

21        MR. KELLY:  I'm not going to put on any evidentiary

22    proof at this point.

23        THE COURT:  Okay.

24        MR. KELLY:  I was going to argue.  I was going to ask

25    you whether you want plaintiffs to argue first, since it's

1    their burden.

2         THE COURT:  Yeah.  Let's talk about that in just a

3    second.

4         So if that closes the proof to be offered, if you've got

5    any witnesses still out there, is that everybody?  I was going

6    to say they can come in.  He says two in the back.  Okay.

7         COURT SECURITY OFFICER:  There are two out there.

8         THE COURT:  I'm going to have them told they can come

9    in if they want.

10        So if we are now to the argument portion, I mean, it

11   seems to me the better sequence would be hear from the

12   plaintiff and then make sure, Mr. Kelly, you have plenty of

13   time to make your presentation, as well; so why don't we do

14   that.

15        MR. KELLY:  I don't disagree with that.

16        THE COURT:  All right.  Thank you.

17        Mr. McTighe.

18        MR. McTIGHE:  I think in terms of the argument, we

19   certainly want to be concise, but address the points the Court

20   may have, not just sit here and read the briefs and

21   everything.

22        With the Court's permission, I was going to focus briefly

23   on some of what we would say is the wrongful termination

24   aspect with walking through some of the bylaws that we talked

25   about in briefing, and then Mr. Butler would like to address

1    the underlying fraud that we're essentially alleging here and

2    believe we have sufficient proof of.

3         THE COURT:  Okay.

4         MR. McTIGHE:  With respect to the termination, and I

5    think this is all laid out in the briefing pretty well, by

6    both sides, in terms of what are our respective views are.

7         The point that we would emphasize is this:  We have these

8    competing sets of bylaws out there, apparently.  Our clients,

9    as we indicated in our reply, we received -- or I should say

10   Mr. Frey specifically received two different sets, both prior

11   to that February 2023 amended set of bylaws that was tendered

12   as an exhibit to Ms. Richter's declaration.  That's the only

13   one we don't know anything about.  The new one.

14        But I think that our point of emphasis is that we can

15   assume for the sake of argument here today, for purposes of

16   this motion, that those February 2023 bylaws are in effect

17   because they violate those two.

18        You know, as you may recall from our initial brief under

19   the bylaws we were looking at, had copies of previously, there

20   were issues with respect to notice and who could vote and who

21   had to take what action.  In fact, there was no member

22   identified.

23        Under their new bylaws, that they have tendered, the

24   actions that were taken still cannot occur because at the end

25   of the day, by statute, a member of a nonprofit corporation

1   does not gain some absolute right to act on behalf of the

2   corporation.

3       What the statutes say, instead, is that that member has

4   whatever rights are conferred by the Articles of Incorporation

5   or the bylaws.

6       THE COURT:  I don't think anybody has shown me the

7   Articles.

8       MR. McTIGHE:  That is correct.  We have not.  Neither

9   side has tendered those.  Get them on the Secretary of State's

10  page, if needed.  But I will represent there is no reference

11  to a member that has been appointed under oath and certainly

12  nothing about member voting rights.

13      THE COURT:  Okay.

14      MR. McTIGHE:  The bylaws that they have, what the

15  member is empowered to do -- and it's a bit odd because it

16  says we're allowing a member to do whatever the member could

17  do previous, and then there's members could do previously.

18      The only thing that is spelled out, though, is what they

19  can do is appoint a board.  The member appoints the board.

20  There is nothing about removal of directors by the member.

21      That would, therefore, need to be done by the board

22  because those bylaws do vest the entire corporate governance

23  in the board.

24      THE COURT:  You think that includes director removal?

25      MR. McTIGHE:  I think that that's the only way you

1    would have director removal, frankly; because, again, the

2    statute says, "A director may be removed as provided for in

3    the articles or bylaws."  And so, again, we're looking at the

4    bylaws.  Quite candidly, Judge, there is no -- there is no

5    reference in those bylaws to removal.

6              THE COURT:  Right.

7              MR. McTIGHE:  What it does is, there is a "cause"

8    provision that states that if you miss so many meetings in a

9    row, then you're essentially deemed to be removed, but that's

10   it.

11             THE COURT:  Right.  Right.

12             MR. McTIGHE:  And so there is no right of Ms. Richter

13   -- assuming she had authority to act for the member, they have

14   not presented that proof to us -- because, again, the bylaws

15   they're relying on require there to a written designation by

16   the member for someone to act for it.

17        So, you know, we're missing that step.

18        But, again, let's assume for the moment that she had

19   authority to act, that the bylaws don't give her authority to

20   remove a director.

21        And so we go back to:  The very first step that resulted

22   in the removal of my client is void ab initio.  It's flawed.

23   It was never permitted in the first place.

24             THE COURT:  Is that true for the '23 change, as well?

25             MR. McTIGHE:  For the '23 change, if -- depending on

1    what actions we are looking at, I think there are significant

2    questions.  For example, they tendered a document with

3    Ms. Richter's declaration that purports to appoint

4    Mr. Varghese as the chair of the board.  Under their bylaws,

5    the member has no right to do that.  That is done by the

6    members -- I'm sorry -- by the members of the Board of

7    Directors.

8            THE COURT:  How about removal of the prior board and

9    installation of the new board?

10           MR. McTIGHE:  Well, so I would say the removal of the

11    prior board, under the bylaws that existed at the time, the

12    board needed to resign.  If we were going to follow to the

13    letter, that board needed to resign, as they said in the term

14    sheet, was going to happen.  But it's fine because presumably

15    they consented to being on -- none of them have come in and

16    said we're still on the board, keep us here.

17        So I think that, you know, we can look at the resolutions

18    and at least imply that they've resigned and not just been

19    arbitrarily removed.

20        If they have resigned, then that does empower the

21    member -- and, again, we'll assume Ms. Richter had the right

22    to act for the member -- at the broad group to appoint a new

23    board and so that would be proper to name those three

24    directors.

25           THE COURT:  Okay.

1         MR. McTIGHE: So that's what we would say. It's --

2 depending on which resolution we're looking at would depend on

3 whether it was permissible or not.

4         THE COURT: How do I look at having the three-member

5 board -- I'm trying not over use the word "member" because --

6 a three-director board -- that presumably could make decisions

7 by majority rule. How do I look at Mr. Frey complaining about

8 his termination, Mrs. Frey complaining about her removal, if

9 the two directors who are aligned with the owner could have

10 accomplished the same thing anyway?

11       How do I look at that? Is that relevant?

12         MR. McTIGHE: I don't believe they could accomplish

13 the same thing because that vote would be tainted by the

14 impermissible conflict of interest, which the bylaws also set

15 out that any director has to refrain in that instance.

16       And here, what we have is a vote to remove that occurred

17 days after a demand letter was sent by counsel saying we have

18 been asking for weeks. We need to account for that 7 million,

19 and we need the information needed for the Medicare reports.

20       And so -- and keep in mind, when we talk about the

21 conflict of interest, it's not just a matter of the desire to

22 cover one's tracks, it gets to the point that that

23 $7,000,000 -- and Mr. Butler will talk more about this -- but

24 is sitting in, or was sent -- we don't know where it is now --

25 was sent to accounts of for-profit entities that the

1    defendants control.

2        So any effort to remove the Freys, based on what occurred

3    here, would be impermissibly tainted by that conflict of

4    interest and they could not vote on that.

5        So Your Honor is exactly right.  You're asking the right

6    question in terms of:  Well, couldn't they vote anyway?  But

7    the answer here is no, because the bylaws prohibit them from

8    doing so.

9            THE COURT:  Okay.

10            MR. McTIGHE:  So I can wrap up here quickly for my

11    part.  That's what we would say in terms of we talk about the

12    substantive claims, we talk about likelihood of success, we

13    talk about the irreparable harm.  That is where we do

14    believe -- and I know the standing issue has been briefed, I

15    guess is still being briefed in the process with the motion to

16    dismiss.

17        But even if the Court were to conclude that a derivative

18    action is not allowed for a nonprofit -- and we would disagree

19    with that.  We think we have submitted case law that would

20    show that is right that was created in equity over a century

21    ago, predates any statutory complications; and, therefore,

22    would exist in this context even without a statute giving a

23    right.  You don't need a statute to give a right that already

24    exists.

25        And so we do believe that there is proper derivative, a

1  derivative claim here.  But even if the Court were to conclude

2  otherwise, the Freys do still have that individual stake to be

3  restored to their positions.

4       THE COURT:  But all of their claims in the current

5  Complaint are derivative.

6     Do you agree with that?

7       MR. McTIGHE:  Yes, Your Honor.  I think we have made

8  references in the pleadings and the briefing to the fact that

9  the effort to reinstate them, you could construe that

10 individually.  We would be happy to amend, if needed, to do

11 so.  But we do think there has been proper notice given of the

12 relief being sought.

13    But yes.  We have pled it derivatively.  Ad we do

14 believe, I guess as I've said, we have derivative standing to

15 proceed because I think in particular it just got filed last

16 night, but the motion to dismiss our response, there was a

17 case that we had quoted where, really, I think it encapsulates

18 the purpose very well, the derivative action of, if you are

19 going to leave that to the board, and the board of wrongdoers,

20 you're asking them to police themselves, to adjudicate their

21 own wrongdoing, which --

22      THE COURT:  What's your best case supporting a

23 derivative action in the nonprofit context?

24      MR. McTIGHE:  Your Honor, if I may, I'll take it from

25 the brief for a moment.  I think, Your Honor, the most -- it

1          would actually be the quick little trilogy we cited at the

2          bottom of page 10 and top of 11, where we have the *Ballard*

3          case, that was a recent Supreme Court case, which emphasizes

4          the point that a nonprofit, the duty is owed to the

5          corporation, not to individual members or others.

6              Well, that's going to beg the question because if the

7          duty is owed to the corporation, who enforces it if the

8          wrongdoers are the ones making the decision whether to enforce

9          it.

10             That's where we get into the *Jones* case, which, as I

11         said, we're going back over a century.  I don't often have

12         occasion to cite a case from the 1800s, but I think that has

13         been followed over the years as well, as reiterated in the

14         that *Ross* case, *Ross v Bernard*, cite the U.S. Supreme Court

15         case discussing the equitable history of that.  We have laid

16         out some more in the response to the motion to dismiss that I

17         certainly think is useful to see.

18             THE COURT:  Do you think there is a distinction in

19         whether there can be a derivative action for money damages

20         versus a derivative action for injunctive relief?

21             MR. McTIGHE:  I do think there could be in that

22         situation, Your Honor, because I think the relief being sought

23         is important.  For example, you'll note the bylaws here

24         refer -- in referring to "director liability," they mirror the

25         statutory standards about setting out what the duty of care

1    is; that they have to be acting, for example, in the best
2    interest of the corporation at all times.
3          And then sets out the provisions that you would
4    expect that, again, mirror the statutes that they're allowed
5    to rely on, professional, et cetera.
6          And then, at the end, includes a provision in the
7    bylaws -- I'm now referring to the bylaws that they have
8    relied on.  It sets out at the end the point that, "Unless
9    there is some wilful or wanton misconduct, you can't have
10   monetary damages claim."
11         Now, we think we do have that here, to the extent there
12   will ultimately be a damages claim in play, we think it's
13   allowed in this context; but, obviously, we're here today for
14   injunctive relief and not for monetary relief.
15         So I do think there could be a difference depending on
16   what relief is being sought.
17              THE COURT:  Okay.
18              MR. McTIGHE:  I hope that answers your question.
19              THE COURT:  Okay.  Anything else you want to say?
20              MR. McTIGHE:  I think that's all from my point, Your
21   Honor.
22              THE COURT:  Okay.  Thank you.
23         Mr. Butler.
24              MR. BUTLER:  Yes, sir.  Thank you, Your Honor.
25         Your Honor, it took me I think awhile to figure out I

1    think what happened here, and I'm going to try to, if I can,

2    walk you through at least from my perspective what's happened.

3         So I'm going to take you back.  I'm really going to focus

4    on the documents in that are in Mr. Kelly's response.

5         So going back to late 2022/2023, the hospital, as

6    Mr. Frey testified, as well as Exhibit 1 in Mr. Kelly's brief

7    references, the hospital was in significant financial

8    difficulties.  I mean, that may be the only thing we all agree

9    on.

10        If you look at this document in Exhibit 1, Your Honor, a

11   couple of things stand out.  So the first thing is Pineville

12   Hospital is entering in this terms agreement with this

13   preservation funding entity, which is Payroll Card Formula.

14        Now, at this point in time, Mr. Varghese's name is not

15   appearing on these documents.  But what the agreement is, is

16   in a nutshell, we're going to give you $700,000.  That's going

17   to help you meet payroll.  That's going to keep this hospital

18   open.

19        The couple other important points of this document, Your

20   Honor, is we're going to do -- this is on page 2 -- we're

21   going to have an option to purchase the hospital for $7.5

22   million at the end of four years, all of the assets shall be

23   unencumbered by any debt or any lien.

24        Then the member is going to -- the manager is going to do

25   their best to refinance that document, that loan, within three

1    months.  Of course, given the hospital's condition, it's not a

2    mandatory provision at that point to refinance because you're

3    supposed to try, you have to do it, but there is -- there is a

4    little wiggle room in the fact that the bank may not refinance

5    depending on the financial transactions.

6        Now, here's what's happened.

7        We get to February the 10th -- and this is Exhibit 2 in

8    Mr. Kelly's briefing.  There is a consent to action without a

9    meeting of the Board of Directors.  So the old Board of

10   Directors involving Mr. Jones and the other people involved in

11   the board, they all then appoint this ACT Abroad Group, and

12   they are going to be the sole member of cooperation.

13       That becomes important.  The ACT member, ACT Abroad

14   company, Your Honor, is a nonprofit, and it is associated with

15   Ms. Richter.

16       So the next document in Mr. Kelly's tab is the Consent to

17   Action without the Board of Directors.

18       And then we're going to come to Number 3, which is

19   Ms. Richter now is acting as the member representative of

20   Pineville Community Health.  There is no documentation about

21   ACT Abroad.

22       But here is where it gets interesting:  Once she obtains

23   the role, she is now the member of the hospital.  She then has

24   this credit agreement, which is Exhibit No. 5.  So on

25   February 10th she enters as the, either the hospital person,

1    the ACT Abroad person, or both, into a credit agreement with
2    her business associate, who she as served as an administrative
3    assistant for, for years with Payroll Card Formula.

4        So what happens, where fraud really begins is here.
5    Number 1 -- and I think this is the most telling thing of
6    all -- there is no documentation that has been presented,
7    despite this Court's order -- to show where the money went,
8    other than they showed a wire transfer to one bank in Iowa and
9    then to another bank.

10       It went to Payroll Card Formula.  There is no
11   documentation that Payroll Card Formula ever, Number 1,
12   attempted to refinance this loan, or refinanced this loan, or
13   paid anything off, other than the First State Bank.  None.

14       What they did do, though, they entered into an illegal
15   agreement, because they both have fiduciary duties to this
16   corporation, and they signed this credit agreement in a --
17   where there is a possibility of $50,000,000 infused into
18   Pineville Hospital.

19       None of that money was ever infused into Pineville
20   Hospital.  There is not one shred of documentation that they
21   presented in their response, despite the Court's order, of
22   showing anything was ever infused into Pineville Hospital.
23   The only proof -- and the truth is, the only money that ever
24   came from this Payroll Card Formula was the $700,000 at the
25   inception on that January 30th terms agreement.

1    So what happens then is because of this document between

2    Ms. Richter, his assistant, and Payroll Card Formula, because

3    coming back, if you look at that first exhibit, the

4    January 30th terms agreement, there's a guy named Christopher

5    Jones that signs as the secretary on behalf of Payroll Card

6    Formula.  I suspect he never even disclosed his association

7    with Payroll Card Formula.  I don't know that.

8    But I know that when we get to the credit agreement, the

9    CEO of Payroll Card formula, on the last page of that

10   agreement, is none other than Mr. Varghese.

11   So he gets -- he pledges that the hospital can ask for

12   $50,000, or $50,000,000 they want.  For that, he gets an

13   upfront $1.5 million -- I'm going to call it a "retainer fee,"

14   like an attorney would.  No work done.  No -- how on Earth

15   that can be justified in any capacity of why a nonprofit

16   hospital would give him a million and a half dollars for

17   nothing, is incomprehensible.  In fact, it's wire fraud, is

18   what it is.

19   The second thing that he gets out of this agreement that

20   his friend assigns to him when there is nobody else looking --

21   none of this stuff happens when Ken Jones and the good people

22   of Pineville and the board would have looked at that.  They

23   don't do any of that in the January 30th meeting.  What they

24   do is, they give him of $1 million a year for ten years for

25   doing absolutely nothing.

1    He just gets it because of the credit agreement.

2    The next thing this guy gets is, is if he for some reason

3    had to loan money, if his friend asked him for money, then he

4    gets 18 percent, which is usury interest rates, on the money.

5    And if they pay it back too quickly -- so if they pay it back

6    within and year -- Mr. Varghese gets a million and a half

7    dollars penalty because the guy paid it back in year.

8    So they literally could ask for $50,000 and turn around a

9    month later and pay the $50,000 back, and you owe him a

10   million and a half dollars.  If you pay it back between year

11   one and year two, well, he would cut them a deal then, Your

12   Honor, then he only gets a million dollars.

13   And if you pay it back after a year two, he only gets

14   $500,000 in prepenalty.

15   The interesting thing then becomes, if we go back to that

16   Exhibit 1, the purchase option for $7.5 million only becomes

17   available if all of the encumbrances and debts are paid off.

18   Well, then when you go back to these documents, once

19   Mr. Jones and the honest people that were trying to help this

20   hospital, are out of the equation, all of the sudden the $7.5

21   million purchase price is just $7.5 million.  No longer do you

22   have to show that all of the debts are paid.

23   So what's happening is, you have Michael Frey who is

24   running the hospital, he's building a business, they're paying

25   their bills, they're making a profit.

1    There is no reason for any of this money to be loaned,

2    but this nonprofit hospital, based upon this fraudulent

3    agreement between these two, is dolling out millions of

4    dollars.

5    So then -- it took me a long time to figure out exactly

6    what happened here -- because with this First State Bank, $2.5

7    million.  I couldn't quite figure out why did they pay that

8    one back and not pay the $4.5 million to the USDA.

9    First of all, I would rather pay off the government than

10   I would pay off any private creditor.  And I didn't understand

11   why they paid the one and not the others, and then it dawned

12   on me.

13   Ken Jones was not only the president of First State Bank,

14   but he was a Board of Director.  He signed this term agreement

15   on February 2nd of 2023, which is Tab 1 of Mr. Kelly's binder.

16   He knew in order for that right to purchase that they had all

17   negotiated to be true, Number 1:  He had to try to do that in

18   three months to pay everybody off and all of the debts had

19   though be paid off for Mr. Varghese to be able to buy the

20   hospital.

21   So what's happening is these guys are paying

22   month-to-month to keep that loan serviced, but they're not

23   paying down, as Michael told you, they're not paying down the

24   interest.

25   Well, the loan became due.  So what does any bank do when

1    the loan becomes due?  Hey, we'll consider refinancing.  Let's

2    look at the collateral.  Let's look at your accounts

3    receivable.  Let's look at your bank accounts.  Are we, the

4    bank, going to be protected if we extend this loan?

5        Well, there's millions of dollars.  They could have just

6    paid the loan off.  They didn't want to do that.  They have

7    already -- Number 2:  They didn't want to give the financial

8    documentation, Mr. Varghese didn't, because he would have had

9    to pay it off.

10       But what happens then, it's so obvious.  Ken Jones, and

11   his bank know, they know, they're supposed to pay that money

12   back or they're supposed to refinance, and once they can't

13   give them these financials, they call the note.

14       So what do you do then if you are a fraudster?

15       You got two choices.  Either A:  You pay the money off

16   immediately, which is what he did, and nobody could ask any

17   questions; or B:  You let it default.  What happens when you

18   default?  Litigation starts.  What happens when litigation

19   starts?  People start asking for discovery.  What happens

20   then?  Well, they finally talk to Susan Scott and they find

21   out, well, the hospital is paying bills, the hospital is

22   meeting payroll.  You talk to Michael Frey, he says, Yeah.

23   We're doing well.  We're starting to make money.  We're in the

24   black.

25       Where is our money?  Why didn't you refinance this

1    hospital?  We would -- had you not sent that Order, we would

2    have never seen this credit agreement because it is, in my

3    mind, it violates is U.S.C. 1343 as wire fraud on its face.

4    That's why they didn't want to give it to them.

5        So what happens is we get to the summer of 2024.  Michael

6    has got to start and Susan have to start preparing this

7    Medicare Cost Report.  As he said -- and I'm sure this Court

8    knows -- and I'm Medicare expert.  We all know this from what

9    we do.  You get in a rural hospital in a small town like I

10    grew up in, in Kentucky.  You don't have Medicare or Medicaid,

11    you don't have a facility because that's what most folks use

12    to pay for their health insurance.  So that is a game changer,

13    deal breaker.  We have got to have this.

14        So you have $7,000,000 that has been moved from a

15    nonprofit hospital to profits that he controls.  Of course he

16    doesn't want to give this stuff up.  Of course he doesn't.

17    They start asking the questions.  Michael is asking the

18    questions.  He's not going to give him the information.

19        Susan is asking the questions, not going to give her the

20    information.  Can't give them the information.  Just delay the

21    cost reports.  Let's just get it done.

22        Then you find out about this voicemail from the bank in

23    Iowa wondering why $6,000,000 has been wire transferred from a

24    nonprofit hospital in Pineville, Kentucky to a profit company

25    called Payroll Card Formula.

1    Payroll Card Formula has only ever lent $700,000 to

2    Pineville Hospital, and that money has been paid back.  So

3    $6,000,000 of charitable money is sitting in a corporation he

4    controls and that bank does what any bank does when you have

5    suspicious activity, he calls to verify the wire transfer.

6    They find out about it September of 2023, 2024.  They start

7    asking more questions.

8    Now it's -- now it's a problem.  Now it's really

9    worrisome because before they thought money had been

10   transferred to the account in the hospital's name.  Now

11   they're finding out there is $100 in an account in the

12   hospital's name, and this guy back here has got $6,000,000

13   transferred to one bank in Iowa.

14   And then he turns around, and I don't know why -- I

15   haven't figured this one out yet -- wire transfers a million

16   and $2 million lumps to another bank, and he doesn't want to

17   produce the information.

18   So this goes on for a couple of months.  Mr. Frey, acting

19   as the CEO of the hospital, hires counsel and says,

20   What do we do?  Let's write a letter demanding this

21   information so we can get it.

22   What -- if you thought, if you thought for a second that

23   this was legal, ethical, and moral, what would you do?  You

24   would pick up the phone and you would call the guy who is your

25   CEO, or his wife who is on the Board of Directors, and you

1    would say, Hey, this is where the money's at.  Let me get you
2    the bank stuff.  Here is why I did what I did.  That's what
3    any honest, descent businessperson would do.  Set up a Zoom
4    call.  Set up a time to come meet.  I mean, this is a guy who
5    has only been to the hospital two or three times his entire
6    life.

7        What does he do?  We needs a little more time.  We'll get
8    back to you.  That's what Ms. Richter does.  And then, without
9    notice, in violation of the bylaws, with a clear and
10   unequivocal conflict of interest -- which means they can't
11   vote on anything -- he gets fired, she gets removed from the
12   board.

13       That is -- I know we're here on a preliminary injunction,
14   Your Honor.  But this is straight up 18 U.S.C. 1343.  This guy
15   stole $7,000,000.  And but for Michael Frey trying to do the
16   right thing and calling, asking nicely, using lawyers nicely,
17   then filing an injunction in state court, and then coming here
18   and testifying and telling you what happened, nobody would
19   have ever known.

20       An interesting thing in the response -- and I'm just
21   about done with my points -- none of this stuff happened, none
22   of this refinance happened.  No attempts were made, none of
23   that.  You asked him for that documentation.  You asked them
24   where the money was.  They showed you the wire transfer and
25   you know what they never showed you?  Where the money is now.

1    Who knows.  Maybe -- I hope for the Pineville Hospital,

2    and I hope for the community of Pineville, that the money is

3    sitting in one of those accounts in Iowa.  I have my real

4    speculation about whether that is true because if it was, I

5    suspect we would know about it, but we don't because I suspect

6    that it is, yet, one more exhibit in a fraud case against this

7    man.

8        So their response to try to somehow avoid -- just make it

9    until tomorrow.  Can we just get by this preliminary

10   injunction.  Can we just let the Court say, We're not going to

11   put Michael back, you guys go forward with your litigation.

12   This will go on for months, the hospital will fail.  Maybe he

13   won't want to continue to litigate, whatever it is, if we can

14   just get by today.

15       What are we going to do?  We're going to slander him.

16   We're going to slander him.  And so you heard him testify

17   about what he did, why he did it.

18       You heard Ms. Scott do it.

19       You've heard about Medicare funding being cut off.

20       You've heard about vendors leaving.

21       You've heard about the hospital going from a positive

22   track where people were excited to work, to working with the

23   court system for juvenile and drug programs.

24       And all of that is gone because he stole the money and

25   they asked him what he did with it.  That's what happened.

1      So, respectfully, we believe that clearly, just at a very

2  corporate level, they violated the bylaws.  This was an

3  improper termination.  They should be restored.

4      To reiterate what the Chad said, the bylaws are very

5  clear I'm --

6          THE COURT:  Well, don't reiterate what he said.  He

7  had his argument.  You probably need to wrap up so I can hear

8  from your opponent.

9          MR. BUTLER:  Yes, sir.  We believe you can and should

10  the restore Mr. Frey to his position as CEO.  We believe

11  Ms. Frey should be restored to the board.  We believe the

12  board can continue to operate because they cannot -- even if

13  they have a majority -- they cannot vote to get rid of them

14  when they have a clear conflict of interest.

15      And we believe, Your Honor, this money should be restored

16  to the hospital immediately.  It is nonprofit money that

17  belongs to that hospital and the people of Pineville, not to

18  Mr. Varghese.

19      Thank you, sir.

20          THE COURT:  Thank you.

21      Mr. Kelly.

22          MR. KELLY:  Thank you, Your Honor.  I'm going to try

23  to lighten us up a little bit because I heard about was

24  slander and wire fraud and illegal agreements with zero proof

25  of any of that.  If they want to go to the U.S. Attorney or

1    the Commonwealth Attorney, then more power to them.

2        But I want to focus on what we're here about, and what

3    the law is.

4        So I represent Mr. Varghese, who is chairman of the board

5    of Pineville Community Health Center, Inc., a nonprofit

6    Kentucky corporation.

7        I represent Sheryl Richter, a member of the Pineville

8    Community Hospital.  Pineville -- I'll call it "Hospital,"

9    Board of Directors, who is now the interim president, and as

10   president of ACT Abroad Group, Inc., the sole member of the

11   hospital.

12       I would say, this suit was filed December 1th and was

13   removed to this court on December 5th, and neither defendant

14   has been served with any Summons or Complaint, and so here we

15   stand, having yet not been served in the case, so I don't want

16   to waive any arguments regarding service of process.  I'm not

17   going to argue service of process, but I just want to make

18   that point and month and a half into this.

19       As I said -- we'll put this on.  I don't want to repeat

20   everything we put in our paper, but Pineville Community Health

21   Center, Inc. was formed in June of 2019 as a result of a

22   liquidation in bankruptcy of the former Pineville hospital

23   entity.

24       Pineville Community Health Center, Inc.

25   is not a party to this litigation, nor has it brought any

1    claims against its lender or any board member for any breach

2    of fiduciary duties.

3         As a threshold matter, we, the defendants believe the

4    Court should decide the legal -- the purely legal issue of

5    whether the plaintiffs have stated a claim.  Ignoring the fact

6    that Mr. Frey was properly removed -- Mrs. Frey was removed

7    from the board and Mr. Frey was terminated.  Even if they were

8    still on the board and were in a president, the Freys cannot

9    pursue the derivative suit on behalf of the hospital; whether

10   they're on the board or off the board.

11        In both our motion -- our response to the motion for a

12   preliminary injunction and our motion to dismiss, and we will

13   file a reply in fairly short order to tee that matter up to

14   the court -- we detailed the legislative history that

15   specifically declined to authorize a derivative action to

16   enforce the rights of a nonprofit corporation.

17        There have been two Kentucky Court of Appeals opinions

18   that have concluded that there is no right to bring a

19   derivative action on behalf of a nonprofit corporation.

20        I'll quote the *Porter versus Shelbyville Cemetery* case:

21   In light of the specific limitations enacted by our

22   legislature, the Court has no authority to recognize the right

23   of a corporate director acting in that capacity to invoke the

24   jurisdiction of the court by bringing an action on behalf of

25   the nonprofit corporation in the namesake of its members.

1           That's a 2009 decision.  And in the ensuing 15 years,

2       Your Honor, there has been no court in Kentucky that has

3       authorized a derivative suit against a nonprofit corporation.

4           The *Bower* case that Mr. McTighe referenced is not a

5       derivative suit.  That is a Supreme Court case that was

6       brought by one member of a nonprofit board against another --

7       I'll call them "members."  One board member versus another

8       board member said, you owe me fiduciary duties.

9           It would be like Mrs. Frey bringing an allegation that

10      Mrs. Richer owes her fiduciary duties.  It was not a

11      derivative suit.  The Supreme Court said, No, they don't.

12      They don't.  Board members don't owe each other fiduciary

13      duties.  They owe their fiduciary duties to the corporation.

14      We don't dispute that.

15          The cases that we cited go through the detailed history

16      of the legislature.  It has looked at this issue.

17      Specifically put in some language that would allow it, and

18      then pulled that language before it passed it.  And despite

19      repeated changes to the statutes governing nonprofit

20      corporations, the legislature has steadfastly not approved any

21      legislation allowing such an action.

22          And the plaintiffs are not going to cite any authority

23      authorizing this suit.  What they have cited is a Law Review

24      article that came out of the *Porter versus Shelbyville*

25      *Cemetery* case I cited that said, Well, that's what we should

do.  Well, maybe that's what Mr. Rutledge, the author of that,
thinks that we should do, but that is not what we have done,
and that's not what the courts have done, and that's not what
the legislature has done.

So we believe that the case should be dismissed as a
matter of law, and until the Court rules on that threshold
issue, the defendants submit the consideration of the
extraordinary relief that the plaintiffs seek here is simply
premature.  So that's it.

I understand we're here, and the Court has ordered us
here on a preliminary injunction case issue.  So our response
lays out the standards that plaintiffs must establish.
Suffice it to say that every decision in the Sixth Circuit --
whether it be in the circuit court or the district court
level, discusses the extraordinary measures that must be met,
the burden before an injunction can be issued.

The Freys have not and cannot meet any prong of the
standard for injunctive relief.

They have raised three issues.  I submit none of which of
are appropriate for injunctive relief.

They claim they were improperly removed from the board
and terminated.  I'm going to address that.

They claim that 14 months ago defendants improperly
transferred money pursuant to a credit facility they had never
seen, are not a party to, and yet they knew about the

1  transfer.

2      And they assert that the Medicaid report was late and

3  somehow an injunction is going to speed that process up.

4          THE COURT:  It is Medicare, correct?

5          MR. KELLY:  It is Medicare.  Did I say Medicaid?

6          THE COURT:  Yes.

7          MR. KELLY:  I apologize.  If I say Medicaid, then I

8  mean Medicare.  It is a Medicare report.

9          THE COURT:  Has that report happened?

10         MR. KELLY:  It has not.  I'll come to that.  It has

11  not.  It will not be six and a half months late this year,

12  but --

13         THE COURT:  I thought the affidavit said it would be

14  the first week of January.

15         MR. KELLY:  It did, and they thought that they were

16  going to get it done and they're haven't, they're still

17  working through.  I'm trying -- I'll answer your question, I

18  don't mean to sidestep Your Honor's question, I'm going to get

19  to that.

20      I'm trying to not delve this into personal animosity,

21  he said/she said; we're fraudsters/you're fraudsters.  Suffice

22  it to say, as we put in our papers, that this commercial bank

23  account was new to my clients and over a million dollars has

24  run through that account.  And before they sign on a Medicare

25  reporting form, they're going to figure out where all of that

1    money is.  And that's been the delay, that we are trying to

2    get.  I can address this issue.  I'll go first on this, but

3    the hospital, the entity, wants the Medicare Cost Report

4    filed.  The Board wants the report filed.  We're working

5    diligently to do that; frankly, the lender wants it filed.

6        I mean, but it isn't -- the hospital's not gotten closed.

7    There is no proof that the hospital is about to close.  The

8    hospital's doing fine.

9        The report, when Mr. Frey was the acting CEO, was six and

10   a half months late last year.  He signed off on it on May the

11   10th.  Medicare approved, took it on May the 20th.

12              THE COURT:  Why is that six and a half months late?

13              MR. KELLY:  It was due November.  It's due at the end

14   of November.  Is that --

15              THE COURT:  Okay.

16              MR. KELLY:  November, December, January, February,

17   March --

18              THE COURT:  Okay.  Fiscal year closes the due end of

19   June.  It's due the end of November --

20              MR. KELLY:  Correct.

21              THE COURT:  -- filed.

22              MR. KELLY:  May 10th.

23              THE COURT:  Okay.  So the current fiscal year report

24   is six weeks late?

25              MR. KELLY:  Correct.

1        THE COURT:  Okay.

2        MR. KELLY:  It's not six and a half months late --

3        THE COURT:  All right.

4        MR. KELLY:  -- as it was under the last

5  administration's tutelage.

6        THE COURT:  Okay.

7        MR. KELLY:  So it will be filed, and it's going to be

8  filed long before May the 10th, I will tell you.  It is not

9  filed as of today, but it wasn't filed as of June the --

10 whatever date we're on -- of January the 10th last year.  It

11 wasn't filed for four more months after that last year.

12       THE COURT:  You're saying that -- is it community

13 Bank?  Commercial bank?  What's the name of it?

14       MR. KELLY:  It's the Commercial Bank.

15       THE COURT:  Commercial Bank.  You're saying that

16 questions about that account, that's what's holding the report

17 up?

18       MR. KELLY:  Correct.  Correct.

19       THE COURT:  Was there a board resolution on the

20 opening of that?

21       MR. KELLY:  Well, there certainly wasn't a board

22 resolution on the opening of it during any of my clients

23 tenure on this.  And my clients certainly was not aware that

24 any money was flowing through a Commercial Bank account.

25          There is -- again, I was trying not to get into the

1    he said/she said.  You know, the proof that we knew about is

2    Mr. Frey's declaration is that he pulled out a credit card one

3    night at a dinner and paid for it on a Commercial Bank

4    account.  That does not tell Mr. Varghese that there is a

5    million dollars worth of checks flowing through a bank that he

6    knows nothing about, and that the only two authorized spenders

7    are Mr. and Mrs. Frey on that account; and, frankly -- again I

8    don't want to get into step and jiggles and all of that.

9              THE COURT:  Right.  I'm just asking about --

10              MR. KELLY:  No.

11              THE COURT:  So there is no resolution during the

12    Varghese, Richter, Frey board tenure authorizing that account?

13              MR. KELLY:  Correct.

14              THE COURT:  Okay.

15              MR. KELLEY:  They don't know about it.  They find out

16    about it in November of this year before they were fired and

17    terminated off the board.  And they started asking questions

18    about it themselves, what's going on?  Why is all of this

19    money flowing through an account that we have never heard of.

20    We don't know anything about it.  Literally, over a million

21    dollars worth of checks with only two people who can sign off

22    the checks.

23         And I will just tell you:  There are lots of checks

24    written to the Freys on that account.  And there are wire

25    transfers.  That is not for today's hearing.  That's for

1    another lawsuit that will be coming.

2        But to answer your question:  That's why it's not field.

3            THE COURT:  Okay.

4            MR. KELLY:  So let me address of the authority.  The

5    Court said, address the authority proprietary of the board

6    changes and the personnel functions.

7        This all started two years ago.  I think this is fairly

8    clear, frankly.

9        In January of 2023, the hospital had been out of

10   bankruptcy for three and a half years.  But it was in default

11   on all of its loans.  It was on the brink of bankruptcy.  No

12   money in the banks to make payroll, and at the time that the

13   Court even noted, guess what, the board was led by the

14   president and the CEO of the lending bank because that's who

15   gets to set the board.  It's the people who are owed all the

16   money.

17       So to save hospital from closure, that board entered into

18   this term sheet that we have identified as Richter Exhibit No.

19   1, and it's dated January 30, 2023.  It allowed for immediate

20   funding of $700,000 by Payroll Card Formula, who would then

21   take over ultimately from First Savings Bank as the new lead

22   institute.  It required -- required -- the then board to

23   appoint a sole member of a nonprofit organization in

24   accordance with Kentucky statutes.

25       It required the board to resign and allow any new lending

1    institute to appoint all board members going forward.  It gave

2    Payroll Card Formula an option to purchase for $7.5 million,

3    and it required a manager not to close the hospital unless the

4    hospital was unprofitable for three consecutive years.  That

5    has not happened.  There has been no effort to close the

6    hospital, and the hospital hasn't been unprofitable.  The new

7    manager was to refinance all the debt within three months, and

8    there a nondisclosure and noncircumvent agreement between the

9    board and Payroll Card Formula and Kentucky Management.

10       So it's not particularly noteworthy or surprising that

11    Mr. Frey has never seen these agreements.  He wasn't a party

12    to them, he wasn't asked to be involved in the negotiations

13    with the board, he didn't sign them, and they're not -- he

14    wasn't a part of them.

15       THE COURT:  You're contention would be that Jones and

16    Reader being on the board, negotiating that deal, even though

17    they're sort of so on both sides, that that's just kind of

18    normal rough and tumble of difficult financial negotiations?

19       MR. KELLY:  That's exactly what I would tell you,

20    Your Honor.  There is no -- I was going to get to it when I

21    got to the credit agreement -- but talking about an illegal

22    wire transfer document.  This was a heavily negotiated

23    document between what they have alleged, what they said in

24    their reply, is the unbiased board at the time and the new

25    people coming in.

1    And I just point out, while we're on it, KRS 273.219 says

2    "A conflict of interest transaction shall not be the subject

3    of equitable relief on the grounds of the directors interest

4    in the transaction if the material facts of the transaction

5    and the directors interests were disclosed or known to the

6    Board of Directors."

7    The Board of Directors at the time -- and would remain

8    the Board of Directors for another two and a half months --

9    negotiated this deal, they were involved in this deal, they

10   signed off on this deal.

11   They knew who Mr. Varghese was.  They knew who

12   Ms. Richter was.  They appointed ACT as the sole member of

13   this company, so -- of the nonprofit.

14   So the fact that they make this allegation that, well,

15   they're on both sides.  That was known to the board.  That's

16   not a conflict of interest issue.  Everybody knew that going

17   in.

18   So what happens?  They sign this deal, and ten days

19   later, on February 10th, the board starts passing consent to

20   actions without a meeting of the Board of Directors.  This is

21   the only -- this is the board who had been controlling this

22   hospital for three and a half years and who would control it

23   for another couple of months.  What do they do?  They voted to

24   appoint ACT Abroad Group, Inc., as the sole member of the

25   corporation.  And that was legally recognized under KRS

1    273.197.

2         Then they pass a resolution amending the bylaws so that

3    the membership shall be composed of a single member, and the

4    single member shall have all of the rights, powers, and

5    privileges granted to members under these bylaws.

6         Then guess what.  They passed a resolution amending the

7    bylaws so that a single member of the corporation should be

8    granted full decision-making authority on any issue that comes

9    before the board.  And they said, "to uphold any office or

10   appoint any members or agents at its sole discretion."  That's

11   what the board said.

12        THE COURT:  Hang on.  Point me to that.

13        MR. KELLY:  Sure.  It is -- resolution is Exhibit 3.

14   Excuse me.  Richter Exhibit 2.  And we also put in the board

15   actual minutes at Richter Exhibit 4.

16        So what I was referencing was a different sentence.  The

17   consent to change them, we put in as Exhibit 4 her

18   declaration, the actual amended board minutes as of

19   February 20, 2023.

20        So if you look at that, it is really article -- it's

21   Article 2.  Membership.  Sections 1 and 2.

22        THE COURT:  Just tell me the docket cite on it.

23        MR. KELLY:  Richter Exhibit 2.  I don't have the

24   number.  I'm sorry.

25        THE COURT:  ECF always.  The lawyers have a number.

1    ECF has a --

2              MR. KELLY:  I should have --

3              THE COURT:  So it's your Number 2?

4              MR. KELLY:  It is my Richter Number 2, correct.  And

5    there are several -- there are two Consent to Act without a

6    meeting of the Board of Directors that the then board signed.

7              THE COURT:  And part that changed, that gave

8    authority to the single member, that I thought you were just

9    quoting --

10             MR. KELLY:  Is on page 2, Item 4.  There is two

11   resolutions that day, so if you're on the -- I mean two

12   Consents to Act.  So if you're on the one that is -- if you

13   look at the bottom of page 2, Number 4 starts with, "The

14   membership shall be composed of a single member..." and rolls

15   over.  That's page 2 and rolls over to page 3, Number 4.

16             THE COURT:  Okay.  So "... shall be granted full

17   decision-making authority on any issue that may have

18   previously been properly brought before any meeting of the

19   members, and to hold any office or appoint members or agents

20   at its sole discretion."

21        Is that what you're relying on?

22             MR. KELLY:  Yes.  Partly.  Yes.

23        "The member shall be entitled to 100 percent of the vote

24   of each matter submitted to a vote of members."

25        So that's what the board of the hospital changed their

1      bylaws to.

2          That's not the board of Mr. Varghese and Ms. Richter

3      and Ms. Frey.  That is the board that had been running the

4      hospital for three and a half years.

5          If you look under the bylaws Article 3, Section 1.  "A

6      Board of Directors shall be elected by a majority vote of the

7      members."

8          And if you look under Article 3, Section 3 -- Article 2,

9      Section 3.  Let's see.  "The presence of a single member of

10     the corporation shall be sufficient for the transaction of any

11     business that may properly come before the meeting."

12         As a matter of law, Your Honor, the former board had a

13     legal authority to pass these resolutions and amend bylaws.

14     That's KRS 273.191.

15         "The power to amend, alter -- actually, alter, amend, or

16     repeal the bylaws or adopt new bylaws shall be vested in the

17     Board of Directors.  Any action required or permitted under

18     KRS 273.161 to 273.990..." -- which is the nonprofit -- "to be

19     taken at a Board of Directors meeting shall be taken without a

20     meeting if the action is taken by the members of the board."

21         So what was done, then was appropriate.

22         On the very same date, then, the then board Board of

23     Directors accepted $700,000, entered into the asset

24     purchase -- entered into an Asset Purchase Agreement for $7.5

25     million; approved the hiring of a new management company,

1    which is headed by Mr. Varghese.

2        Sheryl Richter was then appointed to serve by AG -- AGG

3    to serve as the sole member of representative.

4        And two months later -- so two months, then, and that is

5    also the date that there is the credit agreement, which is

6    somewhat a different issue than the removal of the board.  But

7    that same date while the board is still in power, the old

8    board, this credit agreement is signed.

9        Two months later, on April 14th -- and this is Richter

10   Exhibit 3 -- as the sole member, the sole member removed the

11   Board of Directors appointed by the bank and appointed new

12   three new directors:  Mr. Varghese, Ms. Richter, and Ms. Frey.

13   And member appointed Mr. Varghese as the chair of the board.

14       Like the removal -- like the subsequent removal of

15   Natalie Frey, Ms. Frey, this removal of the former board of

16   directors, which had been appointed by FSB, was completely

17   permissible and lawful and complied with the board's amended

18   bylaws.  The sole member had the authority to remove the board

19   members and appoint new board members.

20       That was true in April of 2023, when Ms. Frey was

21   appointed.  They say that don't know any -- well, they've

22   never seen these consent agreements, and they don't know

23   anything about how she got appointed to the board.

24       She was appointed by the sole member that they now

25   criticize so much.  They didn't show up at the hospital one

1    day and say I'd like to be the board of directors.  They were

2    appointed by Ms. Richter acting on behalf of the sole member.

3    She was appointed.

4        And then that board hired Mr. Frey for $780,000 a year as

5    the president of the hospital.

6        It is undeniable, Your Honor, that the actions were taken

7    in accordance with the company's bylaws and pursuant to

8    statute.  And they don't criticize the former board at all.  I

9    certainly don't criticize the former board at all.

10       I would say that it's kind of irrelevant to me.  It's

11   irrelevant whether the authority is explicit or direct because

12   the sole member of authority given was absolute.  The sole

13   member acting in accordance with the board's laws, the board

14   gave the sole member sole discretion to take all actions.

15       So forcing Mr. Frey -- Ms. Frey, excuse me.  I apologize.

16   It "Fray" or "Frey"?

17            MR. McTIGHE:  Frey.

18            MR. KELLY:  It is "Frey."  Okay.  I knew somebody

19   said "Fray," but I thought it was Frey.

20       Forcing Mrs. Frey back on to the board, forcing the

21   company to reinstate Mr. Frey, would be in direct conflict of

22   the hospital's governing documents.  It is hard to fathom what

23   an injunction would state or how the sole member, who is not

24   even before the Court, the sole member is not sitting here

25   before the Court, could be precluded from appointing directors

1   in its own discretion.

2       To your point earlier:  The sole member gets to appoint

3   the board, the sole member can appoint more board members.

4       Not only do the plaintiffs fail to meet the necessary

5   proof for an extraordinary remedy; it frankly doesn't make any

6   sense because it is contrary to the governing documents of the

7   hospital that everyone now agrees controls.

8       And we would submit the plaintiffs' motion be denied.

9       I do want to address the tracing.  Unless the Court has

10  some questions about that.

11          THE COURT:  Go ahead.

12          MR. KELLY:  Okay.

13      I do want to address the $7 million funds.

14      Your Honor, I pointed out that it is not a conflict on --

15  under the Kentucky statute for them to sign that.  That's, you

16  know, I have heard a lot about conflicts of interest, but no

17  citations in their response, in their reply brief about why

18  there is a conflict.  They say there's this big conflict, but

19  they don't point to a conflict because the statutes make it

20  clear that it is not a conflict in this case.

21      On January 30th, the term sheet contract required new

22  hospital manager to refinance the debt within three months,

23  assuming they could.

24      On February 10th, the hospital, as borrower, and Payroll

25  Card Formula, as the lender, entered into a Credit and

1    Security Agreement that we have produced.  And as Your Honor

2    noted, you haven't been all the way through it; and, frankly,

3    I haven't been all the way through it.  It is a fairly

4    standard Credit and Security Agreement.

5        But I would point out a couple of things here:  Neither

6    the hospital, as the borrower, or Payroll Card Formula, as

7    lender, are here before this Court.

8        They have not been named in a lawsuit.

9        Neither Pineville Community Health or Payroll Card has

10   alleged any improper accounting, a failure to provide funding,

11   or an improper movement of funds; nor has any creditor or

12   secured party of the hospital -- some of whom have priority

13   positions to Payroll -- they didn't step in as the highest

14   priority position in this.  None of them have raised issues

15   about the accounting or funding of the hospital.

16       Instead, here we are.  We have two disgruntled terminated

17   former employee and director who have known about these

18   transfers for 14 months and now, a year later, assert

19   unfounded allegations regarding a Credit and Security

20   Agreement that they admittedly have never seen, who were not

21   involved in the extensive negotiations between the hospital

22   and the lender leading up to its execution, have no idea what

23   is or is not required between the parties who actually

24   negotiated or executed the agreement, and who bear all

25   financial risk should the hospital fail.

1          So let me briefly address the issue of the Court.

2          On October 23, 2023, First State Bank sent a Notice of

3     Default and Demand for Payment on the loan to Pineville

4     Community Hospital.

5          THE COURT:  That is not in the record.  We heard

6     about it today.

7          MR. KELLY:  I have it here, if you would like -- if

8     Your Honor would like.

9          THE COURT:  Well, the record --

10         MR. KELLY:  Yeah.

11         THE COURT:  -- it is sort of closed.  But that hasn't

12    been tendered, but it was testified --

13         MR. KELLY:  Correct.

14         THE COURT:  -- testified today by Mr. Frey.

15         MR. KELLY:  Correct.

16         THE COURT:  Okay.  That was October of '23?

17         MR. KELLY:  October of '23.

18         THE COURT:  Okay.

19         MR. KELLY:  It was sent to Mr. Varghese as chairman

20    of the board, and the balance due on that date was $2,642,782

21    and FSB seized the funds, froze the accounts, as you would

22    expect them to do when you are no longer making your payments.

23    And that Notice of Default had significant legal consequences.

24         The Pineville hospital, just to operate, has a recurring

25    payroll balance of about a million dollars a month, all in.

1    That's everybody they're paying.  So they have got to have a
2    million ready to make payroll every month.
3        And the bank's Notice of Default -- the FSB bank's Notice
4    of Default constituted an event of default under Section 7 of
5    the credit agreement.  In light of that Notice of Default,
6    Payroll Card Formula decided to protect the payroll funds, and
7    what it did is it insulated six months of payroll to ensure
8    the hospital could continue to operate.
9        The Freys don't have to like that.  They're not a party
10   to the deals, but that's what happened.  So six months was
11   held to insulate so we -- so the company would make sure --
12   the lender could make sure that the hospital could make
13   payroll for at least six months.
14       It also, pursuant to the contractual obligations,
15   directed a million dollars to be paid to the hospital
16   management company.
17       If you look -- at I'm not going to stairstep through this
18   whole agreement, this credit agreement.
19       If you look at Section 703, Material Adverse Effects
20   specifies "Any material adverse effect in the borrow's ability
21   to meet its obligations constitutes an event of default."
22       The loss of staff being unpaid would have been the end of
23   the hospital, and it was certainly a material adverse effect.
24       Section 8 of the agreement.  "Rights and Remedies grants
25   the lender broad rights following a default, including taking

1     actions necessary to preserve, protect, and realize the value

2     of the collateral." That's what they had the right to do.

3     That's what they did.

4         Maintain six months of payroll ensures continuity of the

5     borrower's services.

6         Section 805 of the agreement. "Application of payments

7     and proceeds upon default grants to limit the authority to

8     apply funds in its possession to meet obligations and oppose

9     default in a manner that protects its interests."

10         THE COURT: Excuse me, Mr. Kelly. Whatever the

11     lender -- the lender got the funds under the lenders control.

12         But, presumably, they're still subject to the credit

13     agreement, right? They can't just --

14         MR. KELLY: Correct.

15         THE COURT: -- okay, we're going to spend this on

16     personal -- it's not our personal funds; it's subject to the

17     agreement.

18         MR. KELLY: Absolutely correct.

19         Nobody has -- and guess what, nobody has said, I suppose

20     plaintiffs' counsel said it without any proof -- that somehow,

21     somebody had violated the credit agreement. But there has

22     been no allegation.

23         The parties to the credit agreement are not even here

24     before the court. But I don't -- I don't know disagree with

25     you at all that the credit agreement says what it says, and

1  doesn't just willy-nilly allow somebody to take $7,000,000.

2  I'm reporting out, which I think Your Honor is following --

3  that the credit agreement allows all of this and the hospital

4  remains open to this date.

5      THE COURT:  And those other lenders are still out

6  there --

7      MR. KELLY:  Correct.

8      THE COURT:  USDA, Economic Development.

9      MR. KELLY:  I've only been in this case about a

10  month.  I don't know every lender.  There are a number of

11  creditors out there to the hospital.

12      THE COURT:  Okay.

13      MR. KELLY:  It's not -- Credit Card Formula is not

14  the only person sitting there, as you would expect.

15      THE COURT:  And maybe Kentucky Highlands filed a

16  motion to intervene?

17      MR. KELLY:  Correct.

18      THE COURT:  Okay.  So they have got an interest in

19  that money, too?

20      MR. KELLY:  Right.

21      THE COURT:  Okay.

22      MR. KELLY:  And I -- I don't disagree with Your Honor

23  that somebody could say, Kentucky Highlands, for instance.  It

24  is my understanding they have a secure -- they have a higher

25  position.  I mean, they could come in be concerned if they

1    want to be concerned about that.

2        It doesn't prove fraud, as my client is accused of.  It

3    doesn't prove wire transfer.

4        The fact that Mr. Frey, who has never seen this

5    agreement, was not part of the negotiations, and never put up

6    a penny of his own money, doesn't like it or thinks it's

7    unfair, really doesn't matter.

8        And I will just say -- I get that it's not in record.

9    Mr. Varghese is not taking a million dollars a year out of

10   this hospital, paying himself, or taking 18 percent.  You

11   know, what agreements might say or might not say are binding.

12   But what is actually happening.

13       I didn't focus on that 54-, 74-page document.  I don't

14   know what that is, but I can tell you that that hasn't

15   occurred.

16       What I can tell you is that our belief, Payroll Card

17   Formula had every right under the specific terms of the Credit

18   Security Agreement that it negotiated with the bank -- excuse

19   me -- with the hospital to take the actions that it did.

20       If somebody wants to ask this Attorney General or the

21   Commonwealth Attorney to take a look at it, I suppose they

22   could.

23       But the agreement stands.  I believe that Kentucky law

24   still that agreements signed are binding on the parties.

25       Your Honor, the plaintiffs are not parties to the

1    agreement, never seen it, knew about this for 14 months.  When

2    again, I'm not trying to get into personalties here.  When the

3    Commercial Bank issue came up, they were terminated.  But an

4    injunction is not going to change the terms of the credit

5    agreement.  And, frankly, we wouldn't have the right parties

6    to the Court, before the Court, to even issue.

7        The last -- I did the cover the -- unless you have a

8    question, I was going to move on.

9        I did cover the status of the Medicare report and where

10    it stands.

11        So in conclusion, Your Honor, I would say for first and

12    foremost, the hospital is not in danger of closing.  For one

13    thing, has a $50,000,000 credit agreement.  It can draw on its

14    line any time.  And there is a commitment that it will not be

15    closed unless the profits -- unless operations were

16    unprofitable for three consecutive years.  That agreement was

17    signed two years ago and it hadn't occurred yet.  So we're

18    three years out before the hospital could close, could be

19    closed under the terms of the agreement.  So there no danger

20    of this closing right now.

21        There is no imminent irreparable injury to anyone, much

22    less the Freys, and other than the hospital itself, if this

23    Court were to enter an injunction in this case, at bottom this

24    case is a claim by the Freys that they were unjustly

25    terminated, but they have not sued the hospital that

1    terminated them.  Instead, they have attempted to shoehorn

2    their claims into a derivative action and seek injunctive

3    relief over money.  They have no legal authority to bring this

4    action, nor the parties -- I don't want to keep repeating --

5    even before the Court who could somehow, I suppose the Court

6    could issue an injunction everybody that is affiliated, but I

7    would suggest that Payroll Card Company would need -- Payroll

8    Card Formula would need to be involved in the case.

9          The former board also controlled by the hospital's then

10   lender properly amended the bylaws.  There is no allegation

11   that they didn't.

12         The sole member of the nonprofit was given 100 percent

13   discretion to appoint and remove directors, and the sole

14   member appointed the board, including Mrs. Frey, in April of

15   2023.  And the sole member removed Mrs. Frey a year and a half

16   later and appointed a new member.  And that newly constituted

17   board, that had a meeting and terminated Mr. Frey.  All of it

18   was done pursuant to Kentucky statutes and the corporate

19   bylaws.

20         The plaintiffs cannot succeed on the merits because they

21   haven't stated a claim.  And they certainly lack a strong

22   likelihood of success.  They, themselves, will not suffer any

23   irreparable injury.  They are the plaintiffs.  They don't --

24   haven't suffered an irreparable injury.  If they were

25   improperly terminated, they could sue the hospital.  They know

1    where courthouse is.  They know how to bring a lawsuit.  But

2    the hospital is not closing, and the defendants have the right

3    to follow the hospital's bylaws; and the hospital, who is not

4    present, has the right to comply with its credit agreements,

5    and there no basis for this Court to entertain the

6    extraordinary and unprecedented relief that the plaintiffs

7    seek.

8         We would suggest, Your Honor, that the motion should be

9    denied and our motion to dismiss should be granted.

10        THE COURT:  All right.  Thank you.

11        I'm going to give the plaintiff just a few minutes to

12   sort of have the last word.  If you could keep it within ten,

13   I would appreciate it.

14        I do want to get everybody home safely.

15        MR. McTIGHE:  I appreciate the Court's time on this.

16        THE COURT:  Of course.

17        MR. McTIGHE:  Try just to address a few points in

18   rebuttal to what Mr. Kelly has argued.

19        I would like to amend an earlier comment with respect to

20   the best case on the derivative point.  And that would be in

21   our response that was filed last night -- and courtesy of --

22   credit to Ms. Gumbel for flagging what is the *Pittsburgh* case.

23   That's 72 SW 822.  Pin cite 827.  That's where the Court made

24   comment, I did earlier, the quote about why you need to have

25   equitable remedy for derivatives because otherwise you turn

1    over the wrongdoer.

2         In terms of this being a derivative case, again, we don't

3    need to go over the law, but I think the fact that the Freys

4    are bringing this derivatively speaks to the true motives

5    here.  They could sue the hospital.  If all they cared about

6    was money, sue the hospital and ask for that payment.

7         You know, you've cost me X dollars a year, you are

8    costing me a lot of money.  That's not what they have done.

9    What they have done is come forward for this hospital to try

10   to save this hospital.  They care deeply.  I think you heard

11   Frey testify to that earlier.  This is important to them.

12   That's why they're doing this.

13        When we talk about the Medicare report -- and that is a

14   significant one.  Keep in mind, they keep making reference to

15   all of this time Mr. Frey was in charge and it was late.

16        Mr. Frey didn't step in until the later part of that

17   process, as he testified to.  Dr. York, the then CEO, was

18   trying to go through the process, wasn't having much luck with

19   the defendant's apparently; and so Mr. Frey eventually got

20   that report done, but we do need to clarify and correct that

21   point on the record.

22        I would also say they were refer entirely to this

23   Commercial Bank.  Multiple witnesses have testified that they

24   were aware of it.  Mr. Staff, the hospital administrator, who

25   is now on their board used it.

1          Mr. Brown, who submitted a declaration, testified that

2     Mr. Varghese has always had full access to everything and the

3     hospital financials.

4          Ms. Scott testified to these financials being available.

5          This, it simply doesn't hold water.  It is not a credible

6     argument to say that they can't get the Medicare reports filed

7     because there's a mystery account that we didn't know about,

8     but we have been using and the hospital has been accounting

9     for and using for years.

10          Again, while Mr. Varghese is supposedly chair of the

11     board and while Ms. Richter is managing things for the member

12     and has identified herself as the board secretary.

13          So it just -- it strains credulity to indulge that idea

14     that this bank account is somehow the problem.  The problem is

15     you can't account for $7,000,000 in a lawful and appropriate

16     way.

17          And I would like to come back to the point about the

18     prior board because I think this is important.  If we look at

19     the resolutions that defendants submitted -- and I'm looking

20     right now at document -- it's an ECF document, 11-3.  I.D.

21     Number 170.  This is a resolution that's refers to a credit

22     agreement with PCF.  And what it says is that the board

23     approves getting a credit agreement in the amount of $700,000.

24     It then says "The Board and Directors acknowledge that this

25     funding is memorialized in a separate hearing with PCF."  And

1    that The Board of Directors -- "Board of Directors is

2    authorized to enter into and execute said agreement on behalf

3    of the corporation."

4        What we don't see is a separate agreement for $700,000.

5    What we see is a separate agreement for a $50,000,000 credit

6    facility that they're going to owe -- the hospital is going to

7    owe millions of dollars on just by virtue of opening it up.

8        And what we also do not see if that 77-page document, any

9    signature from this Board of Directors.

10       So if that's what's being referred to here, what they

11   submitted is not an agreement that was authorized by that

12   prior board.  What we have is a credit facility with PCF that

13   is signed by Mr. Varghese on one side and Ms. Richter on

14   other, with none of these independent and, admittedly, you

15   know, no one -- again, no one is claiming any issue with the

16   former board members.  None of them were on it nor would they

17   have been.

18       Speaking about the members power, and what the member can

19   or can't do, I would direct the Court, as well, again, using

20   their bylaws -- if we look at Docket 11-5, I.D. Number 181,

21   that refers, I believe Mr. Kelly was paraphrasing this

22   earlier.

23       Article 2, Section 1.  "Membership shall be composed of a

24   single member, which shall be a nonprofit corporation.  The

25   member shall act as the sole member of the corporation and

1    shall all rights, powers, and privileges..." -- and here is

2    the important part -- "granted to members under these bylaws."

3          What you are not going to find in these bylaws is

4    anything that says the member can go sign credit facilities

5    for $50 million where we're going to owe -- the hospital is

6    going to owe a million-five on Day 1, and it's going to owe a

7    million dollars a year, even if it never borrows a dime, and

8    it's going to pay 18 percent, if at any point in time it takes

9    out one of the loans up to a million dollars that it is

10   allowed to take, going through an application process.

11         It never says the member can do that.

12         It never says the that the member can remove a director.

13         It never says the member can do any of these actions that

14   they are claiming.

15         So I agree.  I'll use their bylaws.  We can look at their

16   bylaws and say these are the ones, February 10, 2023, because

17   it is flatly against the actions that they have taken.

18         With the last comment on this new theory, which we're

19   just hearing today, about needing to secure payroll.  I have

20   taken a pretty deep look, as I know Mr. Butler has as well,

21   into that lengthy credit agreement.

22         And I have seen what the defendants have cited as

23   supporting their position that they could take millions of

24   dollars.  If you read those provisions they cited, and you

25   don't even need to look at the rest.  Look at the provisions

1       the parties have cited.  They do not permit PCF who, by the

2       way, has not loaned a dime at this point.  There is nothing

3       owed to it.  It has nothing to secure.  It may have rights to

4       seek a recovery from the hospital to secure its obligations,

5       PCF's obligations.  It does not have -- I think Your Honor

6       touched on this a few moments ago with your questions.

7       It doesn't have some right to sweep money out of the

8       hospital.  And it is baffling to me that if a bank, an

9       independent third-party bank, calls in a $2.5 million loan,

10      the response from this creditor, who is not owed a dime, they

11      have not -- they haven't paid anything, they haven't loaned

12      anything, they haven't advanced anything -- somehow they get

13      to take $7,000,000.  I'm sorry.  Let me amend that.

14      $6,000,000, and order a million to go to Kentucky Medical,

15      which is also defendant's company.

16      There is nothing in this credit facility or logic that

17      would allow that course of action, a third-party bank says 2.5

18      million is owed, I'm going to take 7 million from you.  And

19      then I'll get that paid and maybe I'll tell so that he doesn't

20      ask questions.  I think Mr. Butler outlined that and I'm not

21      going to replow that ground.

22      But that is not in that credit facility.  There is

23      nothing in that document that could support that.  And again,

24      it makes no sense.  If they were owed 10 million, 20 million,

25      $30 million that they have advanced, we would have heard about

1     it.  We would have seen documentation of it.

2        What they've instead, is a piggybank that Mr. Varghese is

3     magnanimous and has not taken a million-five or the million

4     that's owed yet, but that's what is owed under the documents.

5        So it is there as a cash cow with PCF doing nothing.

6     There is an reason we don't see other creditors in the

7     courtroom at the moment, but at least they're creditors.  This

8     wouldn't be a matter between PCF and the creditors if the bank

9     comes in says you compromised my collateral, they're the ones

10    who have the right.

11       As we pointed out in our reply, they have given some UCC

12    statements that have never been filed.  Those are meaningless.

13    If a creditor has a claim, the creditor has a claim.

14       And, Your Honor, I think that's all I have in rebuttal

15    for now.  I hope I kept it under the ten-minute mark.

16       Unless you have further questions for us.

17            THE COURT:  Okay.

18            MR. McTIGHE:  But we do ask the Court grant relief

19    for the benefit of this hospital who we sued derivatively for

20    and let this matter move forward, and let the hospital move

21    forward.

22            THE COURT:  All right.  Thank you very much.

23       My case manager says she's hearing the roads are getting

24    bad so probably a good time to stop.

25       I intend to turn to this promptly and get a decision out

1    promptly.  I will watch for the reply on the motion to dismiss

2    as well.  Not necessarily saying I'm going to wrap them

3    together because the focus today is the ripe motion.  But as

4    promptly as I can, I'll decide it and communicate that

5    decision and we'll go forward based on the content of that

6    decision.

7         Is there anything else we can take up or need of to take

8    up today, Mr. McTighe?

9              MR. McTIGHE:  Not for the plaintiffs, Your Honor.

10              THE COURT:  Mr. Kelly.

11              MR. KELLY:  No, Your Honor.

12              THE COURT:  Appreciate of the attendance of the

13    parties and those who have come with interest in the case

14    today.  Thank you to the witnesses who participated as well.

15         The matter will be submitted for a decision.  Everybody

16    get home safely.  We'll stand adjourned.

17         (Proceedings adjourned at 12:08 p.m.

18                              - - -

19              C E R T I F I C A T E

20              I, KIMBERLEY ANN KEENE, RMR, certify that the
     foregoing is a correct transcript from the record of
21    proceedings in the above-entitled case.

22

23    /s/ Kimberley Ann Keene, RMR          June 6, 2025
     KIMBERLEY ANN KEENE, RMR              Date of Certification
24    Official Court Reporter

25

1                          INDEX
**PLAINTIFF'S WITNESSES**
2
**MICHAEL FREY**
3  Direct Examination.............................. Page 5
Cross-Examination.............................. Page 44
4
**SUSAN SCOTT**
5  Direct Examination.............................. Page 55
Cross-Examination.............................. Page 61
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25